# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RAFFEL SYSTEMS, LLC,

      **Plaintiff,**

      **v.**                              **Case No. 18-CV-1765**

MAN WAH HOLDINGS LTD, INC.,
MAN WAH (USA) INC., and XYZ
COMPANIES 1-10,

      **Defendants.**

---

**DECISION AND ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS, PLAINTIFF'S MOTION TO STRIKE, DEFENDANTS' MOTION TO CONDUCT LIMITED DISCOVERY, DEFENDANTS' *DAUBERT* MOTION, PLAINTIFF'S MOTION FOR SANCTIONS, AND VARIOUS MOTIONS TO SEAL**

---

# Table of Contents

Introduction ................................................................................................................ 3

Background ................................................................................................................. 4

Summary Judgment Standard ..................................................................................... 6

Analysis ...................................................................................................................... 7

    1. Utility Patent Infringement ................................................................................... 7

        1.1 Applicable Law ........................................................................................... 7

        1.2 Summary of Arguments ............................................................................. 10

        1.3 Removable Flange ..................................................................................... 10

            1.3.1 Literal Infringement ......................................................................... 11

            1.3.2 Infringement Under the Doctrine of Equivalents ............................ 13

        1.4 Lighted Element Connected to Light Source .............................................. 15

            1.4.1 Literal Infringement ......................................................................... 16

        1.5 Summary of Rulings on Utility Patent Infringement .................................... 18

    2. False Marking ..................................................................................................... 18

3. Trade Dress Claims.................................................................................................21

   3.1 Applicable Law ................................................................................................21

   3.2 Trade Dress Infringement Claims ....................................................................23

      3.2.1 Specificity ..............................................................................................23

      3.2.2 Distinctiveness ......................................................................................25

   3.3 Trade Dress Dilution .......................................................................................27

   3.4 Summary of Remaining Trade Dress Claims ...................................................28

4. Whether the '986 Patent is Invalid Due to On-Sale Bar................................................29

5. Declaratory Judgment Claims – Raffel's Motion for Partial Judgment on the Pleadings .........29

   5.1 Applicable Law ...............................................................................................30

   5.2 Analysis...........................................................................................................31

6. Design Patent Infringement...............................................................................................35

   6.1 Applicable Law ...............................................................................................36

   6.2 Analysis...........................................................................................................37

7. Breach of Contract Counterclaims and Motion to Conduct Limited Discovery .....................41

   7.1 Whether Raffel is Bound by the Supplier Contracts .......................................42

   7.2 Validity of 2017 Agreement.............................................................................45

   7.3 Breach of the Agreements ................................................................................46

      7.3.1 Dispute Resolution Clause ....................................................................46

      7.3.2 Exclusivity Clause.................................................................................48

   7.4 Man Wah's Motion to Conduct Limited Discovery .........................................49

8. Raffel's Motion for Sanctions ...........................................................................................50

**Conclusion** .......................................................................................................**52**

Case 2:18-cv-01765-NJ   Filed 11/05/21   Page 2 of 54   Document 361

# INTRODUCTION

Raffel Systems, LLC alleges that it is the owner by assignment of all rights, titles, and interests in five utility patents for lighted cup holders for seating arrangements[1] and one design patent for the ornamental design of the cup holders.[2] Raffel brings fifteen causes of action against Man Wah Holdings Ltd., Inc., Man Wah (USA) Inc., and XYZ Companies 1–10 (collectively "Man Wah"), including false marking, patent infringement, trade dress infringement, and breach of contract. (Fourth Am. Compl., Docket # 108.) Man Wah brings twenty-eight counterclaims against Raffel, alleging, among other causes of action, non-infringement and invalidity/unenforceability of the patents at issue and breach of contract. (Am. Answer and Counterclaims, Docket # 193.) The parties have filed cross-motions for summary judgment. Raffel moves for summary judgment as to certain claims of the patents at issue, including: (1) claims 1, 10, and 12 of the '293 Patent; (2) claims 1, 2, 3, 5, 8, and 10 of the '505 Patent; (3) claims 1, 2, 3, 5, 12, and 13 of the '882 Patent; and (4) claims 1, 2, 7, 8, 9, 10, and 11 of the '603 Patent. Raffel also moves for summary judgment on its false marking claim under 35 U.S.C. § 292 and on Man Wah's contract counterclaims. Man Wah moves for summary judgment relating to Raffel's claims for false marking, trade dress infringement, and infringement of the patents at issue, as well as on certain damages theories put forth by Raffel and certain declaratory judgment requests by Man Wah. For the reasons explained below, both parties' summary judgment motions are granted in part and denied in part.

---

[1] U.S. Patent No. 8,973,882 ("the '882 Patent"); U.S. Patent No. 10,051,968 ("the '968 Patent"); U.S. Patent No. 8,714,505 ("the '505 Patent"); U.S. Patent No. 7,766,293 ("the '293 Patent"); and U.S. Patent. No. 10,299,603 ("the '603 Patent").
[2] U.S. Patent No. D643,252 ("the '252 Patent").

3

# BACKGROUND

Raffel is a manufacturing company with a range of products in the seating, bedding, and industrial marketplaces, which competes in various seating, bedding, and industrial markets, such as, for example, in the market for cup holders including, but not limited to, Raffel's Home Theatre and Integrated Cup Holder products (referred to herein as "Raffel's ICH Products"). (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 4, Docket # 293 and Def.'s Resp. to PPFOF ("Def.'s Resp.") ¶ 4, Docket # 328.) Raffel sells silver cup holders that it refers to as "CHB Products." (*Id.*) Raffel's investments during its time in the industry involved the lighted cup holder for seating arrangements reflected in U.S. Patent No. 7, 766, 293 ("the '293 Patent"), U.S. Patent No. 8,714,505 ("the '505 Patent"), U.S. Patent No. 8,973,882 ("the '882 Patent"), and U.S. Patent No. 10,299,603 ("the '603 Patent"). Raffel is the owner by assignment of the '293 patent, the '505 patent, the '882 patent, and the '603 patent (collectively, the "Asserted Patents-in-Suit"). (*Id.* ¶ 5.)

Raffel's relationship with Man Wah began in Spring 2015, when Man Wah requested samples of Raffel's integrated cup holder for use in its furniture samples. (*Id.* ¶ 7.) Raffel provided the samples to Man Wah under the assumption that the samples would be used for the August 2015 Las Vegas Furniture Market. (*Id.*) On August 18, 2015, Raffel contacted Guy Ray, President of Man Wah USA, regarding the samples Raffel had sent to Man Wah to be used in showroom furniture. (*Id.* ¶ 8.) The email stated: "I am sure you are not aware that Raffel holds patents on this product and the cup holders used by Man Wah may be in violation of one or more of these patents." (*Id.*) Ray responded that: "I am not aware of any of this. Please forward me the info of the items you provided, to whoms [sic] attention you shipped

4

to, where your product is manufactured and shipped from, and the cost for each. I will look into and get back to you promptly." (*Id.*) On August 19, 2015, Raffel sent pricing information for its existing integrated cup holder with power recline, headrest, and light to Man Wah. (*Id.* ¶ 9.)

On October 16, 2015, Paul Stangl, President of Raffel, met with Ray in the Man Wah showroom at the High Point Fall Furniture Market to "inform him of the Raffel patents on the cup holder products and to discuss supplying Man Wah's cup holder needs." (*Id.* ¶ 10.) While in the showroom, Stangl observed that Man Wah was displaying and offering for sale furniture containing the eMoMo HX43 line of cup holders that Raffel believed infringed its patents. (*Id.*) On October 31, 2017, Xiamen Raffel (a fully-owned subsidiary of Raffel) forwarded pictures of black and silver cup holders to Man Wah. (*Id.* ¶ 11.) The pictures attached to the October 31 email depicted U.S. Patent Nos. on each of the cup holders. (*Id.*) On November 2, 2015, Man Wah requested additional samples of Raffel's integrated cup holders, which Raffel provided. (*Id.* ¶ 12.) Man Wah sent Raffel's black cup holder to Chinese companies such as Long Rui to allegedly manufacture "knock off" cup holders and in 2018, Man Wah began sourcing the accused silver cup holders from the same alternative supplier (Long Rui). (*Id.* ¶ 13.) Raffel alleges that Man Wah deliberately copied Raffel's product in order to find a lower cost provider for its proprietary cup holder. (*Id.* ¶ 15.)

Man Wah manufactures a variety of styles of chairs and sofas under the "Cheers" brand name, and Raffel alleges that some of these chairs and sofas include Accused Cup Holder Products and that Man Wah offered to sell, sold, and imported the sofas and chairs into the United States. (*Id.* ¶ 17.) Man Wah initially represented that it purchased

5

approximately 46,203 units of the accused cup holders from December 2017 to November of 2018 and shipped about 44,579 pieces of furniture with the accused or Raffel cup holders to 138 different customers in the United States. (*Id.* ¶ 18.) In a confidential March 27, 2019 internal Man Wah email, Man Wah provided a "tutorial" with a side-by-side picture to enable Man Wah employees to identify a Long Rui accused black cup holder from a Raffel cup black cup holder—"[i]f there are characters inside the cupholder, it's Raffel's cupholder." (*Id.* ¶ 22.)

## SUMMARY JUDGMENT STANDARD

Both parties move for summary judgment in their favor on various claims. Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must

be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

When both parties move for summary judgment in their favor on the same issue, "the court must consider the evidence through two different lenses." *Lessley v. City of Madison, Ind.*, 654 F. Supp. 2d 877, 890 (S.D. Ind. 2009). Specifically, "[w]hen considering defendants' motion[ ], the court gives plaintiffs the benefit of conflicts in the evidence and favorable inferences. When considering plaintiffs' motion[ ], defendants receive those benefits." *Id.*

## ANALYSIS

*1.     Utility Patent Infringement*

1.1     Applicable Law

A patent includes two basic parts: a written description of the invention and the patent claims. The "claims" of a patent are the numbered sentences at the end of the patent that describe what the patent owner may prevent others from doing. *See* Pattern Civil Fed. Jury Instructions for the Seventh Cir. § 11.2.4 (2008). The "claims" of a patent "define the metes and bounds of the invention entitled to protection by the patent." *Black & Decker (U.S.), Inc. v. Home Prod. Mktg., Inc.*, 929 F. Supp. 1114, 1118–19 (N.D. Ill. 1996). Patents typically contain both independent and dependent claims. An independent claim stands on its own and does

7

not refer to any other claim; therefore, it is read separately when determining its scope. *Id.* A dependent claim references at least one other claim and incorporates the elements of the claims to which it refers. *Id.* Claims describe the invention by a series of limiting words or phrases called "limitations." *Id.*

Federal law prohibits one, without authority, from making, using, offering to sell, or selling any patented invention within the United States or imported into the United States. 35 U.S.C. § 271(a). In determining patent infringement, the "essential inquiry" is this: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *see also Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) ("'In order for a court to find infringement, the plaintiff must show the presence of every . . . [limitation] or its substantial equivalent in the accused device.'") (quoting *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994)). Ultimately, to establish that an accused device infringes a patent, the plaintiff must show that every limitation set forth in a disputed claim or claims is found in the accused device exactly or by a substantial equivalent. *Black & Decker (U.S.), Inc.*, 929 F. Supp. at 1119.

To resolve this question, the Federal Circuit has established a two-step analysis. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). First, the court determines the scope and meaning of the patent claims asserted,[3] and second, the properly construed claims are compared to the allegedly infringing device. *Id.* The determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Gart*, 254 F.3d at

---

[3] The Court's Decision and Order on Claims Construction was entered on June 15, 2020. (*See* Docket # 190.)

1339. An infringement issue is properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents. *Id.* If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law. *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1374 (Fed. Cir. 2009). Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1129 (Fed. Cir. 2008). However, if the accused product is missing an equivalent element to even one limitation recited in the asserted patent claim, it cannot infringe the claim under the doctrine of equivalents. *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005).

Because dependent claims reference at least one other claim and incorporate the elements of the claims to which it refers, and because a claim is not infringed unless all limitations in the claim are found in the accused product, a finding of non-infringement of an independent claim necessarily means that a claim of infringement of the dependent claim fails. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed."); *MOAEC, Inc. v. Pandora Media, Inc.*, 607 F. Supp. 2d 980, 997 (W.D. Wis. 2009) ("Because claims 6 and 7 are dependent from claim 1, a device cannot infringe claims 6 or 7 if it does not infringe claim 1.").

9

1.2    Summary of Arguments

Both parties move for summary judgment in their favor as to certain claims in each of

Raffel's five utility patents. Man Wah only challenges two specific claim limitations: (1) the

flange on each of the accused products is removable and (2) the lighted element in each of the

accused products is "attached" to the light source. Man Wah groups these into the "A" claims

(the flange) and the "B" claims (the "attached" lighted element). Man Wah asserts that the

"A" claims include: Claim 12 of the '293 Patent; Claims 1, 2, 3, 5, 8, 10 of the '505 Patent;

Claims 1, 2, 3, 5, 12, 13 of the '882 Patent; Claims 9, 10, 11, 13 of the '968 Patent; and Claims

1, 2, 7, 8, 9, 10, 11, 16 of the '603 Patent. The "B" claims include: Claims 1, 10, 12 of the '293

Patent. (Defs.' Br. in Supp. of Summ. Judg. at 18, Docket # 295-2.) Man Wah argues that

every claim in Group A includes the requirement of a "flange" and every claim in Group B

includes the requirement of an elongated lighted element that is "attached" to the light source.

(*Id.* at 18–19.) I will address each challenged limitation in turn.[4]

1.3    Removable Flange

During the claim construction phase of this litigation, the parties disputed the meaning

of the term "flange." Raffel contended that "flange" was construed according to its plain and

ordinary meaning, which it argued included both removable and non-removable flanges.

(Docket # 190 at 13.) Man Wah, on the other hand, argued that "flange" was limited to non-

---

[4] Raffel argues that because Man Wah only challenges two limitations of the asserted claims it has conceded
that the other limitations of the asserted claims are met by the accused products. (Pl.'s Reply Br. at 2, Docket #
336.) I agree. Because Man Wah did not challenge the other limitations of the asserted claims, it cannot later
challenge Raffel's claims of infringement based on requirements not challenged on summary judgment. Also,
although neither party specifically moves on independent claim 6 of the '293 Patent (and its dependent claims
7, 8, and 9), this claim also contains a limitation for "a lighted element including an elongated member of
translucent material having the light source attached thereto to be illuminated thereby" ('293 Patent col.8 6.27–
29) and thus will also be addressed herein.

10

removable flanges. (*Id.*) I determined that the prosecution history, coupled with the drawings and specifications, supported construing "flange" as "non-removable, attached to the cup holder body as a single unit." (*Id.* at 18.)

### 1.3.1    Literal Infringement

Man Wah argues that the group "A" claims all require a "flange," which has been construed by the Court as "non-removable, attached to the cup holder body as a single unit." It argues that the accused cup holders do not contain the "flange" requirement because the flange on the accused products are removable.

The crux of Raffel's argument is that the flange on the accused cup holders is only removable through destructive means. (Pl.'s Br. in Supp. of Partial Summ. Judg. at 5–9, Docket # 292-1.) Raffel argues that Man Wah's expert, Steven Ricca, was only able to physically separate the flange from the accused cup holder body through destructive testing and force. (*Id.*) Man Wah counters that because the flange of the accused cup holder is joined to the cup holder body by screws (which are by their nature removable), the flange is removable. (Defs.' Br. in Opp. at 3–7, Docket # 326.) Thus, Man Wah argues that Raffel's infringement claims fail because there is no evidence that any flange on the accused cup holders is non-removable, attached to the cup holder body as a single unit. (*Id.*)

Although the parties seemingly dispute the meaning of the word "non-removable," there is no great mystery in the definition. Just about anything can be "removed" with the exertion of enough brute force, but clearly if an object needs to be physically destroyed in order to "remove" a part, the part is not "removable" in the ordinary sense of the word. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999) ("Screws, unlike rivets and

11

laminates, are meant to be unscrewed, that is, to be removed. A rivet or a laminate, to the contrary, is meant to remain permanent, unremovable unless one is bent on breaking the permanent structure apart."); *see also Little Giant Pump Co. v. Diversitech Corp.*, 505 F. Supp. 2d 1107, 1111 (W.D. Okla. 2007) ("The common, ordinary meaning of removable or removably, however, does not include breaking what is meant to be a permanent connection.").

Turning to the record evidence, Man Wah relies principally on the opinion of its expert, Steven Ricca, who opined that the flange on the accused cup holders are removable because the flange is a separate part that is fastened to the cup holder body by a couple of screws and can be easily disassembled with a screw driver. (Declaration of Clark Bakewell ¶ 6, Ex. 1, Rebuttal Expert Report of Steven Ricca, dated August 28, 2020, Docket # 303-1 at ¶ 42.) Raffel's primary counter to Ricca's expert report is its own expert report by Ronald Kemnitzer, who opined that the flange of the accused products is "non-removable and attached to the cup holder as a single body." (Bakewell Decl. ¶ 13, Ex. 8, Expert Report of Professor Ronald B. Kemnitzer, dated July 22, 2020, Docket # 303-8.) Raffel also argues that the flange of the accused product is not removable because Ricca needed to use tools to remove hot glue and screws. (Pl.'s Br. in Supp. of Summ. Judg. at 7–8.) Raffel argues that because Ricca "removed hot glue, this is not something that could be simply reassembled such as a screw top that can be screwed on and off." (*Id.* at 8.) Raffel further argues that Ricca testified that once he disassembled the cup holder, it could not be reassembled without special training and the purchase of new parts. (*Id.* at 8–9.)

Raffel misconstrues Ricca's testimony. Ricca clearly testified that the purpose of the hot glue was "strain relief to keep the wires from moving" (Declaration of John C. Scheller ¶

1, Ex. 1, September 29, 2020 deposition of Steven Ricca at 39, Docket # 281-1), and that the hot glue connected the wire to the circuit board for the button control (*id.* at 60). In his expert report, Ricca states that the flange of the accused cup holder is fastened to the cup holder body by a couple of screws and can be easily disassembled with a regular screw driver. (Ricca Rebuttal Expert Report at ¶ 63.) The photograph shows the flange removed from the body of the cup holder, without destruction of either piece. (*Id.*) Because the flange of the accused product is removable while Raffel's flange is not, the accused product does not literally infringe Raffel's patent.

### 1.3.2   Infringement Under the Doctrine of Equivalents

My analysis, however, does not end there. I must next address whether the accused products infringe under the doctrine of equivalents. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Bondyopadhyay v. United States*, 136 Fed. Cl. 114, 122–23, *aff'd*, 748 F. App'x 301 (Fed. Cir. 2018). In *Warner–Jenkinson Co.*, the Supreme Court identified two possible approaches to analyze whether there is equivalence: the "insubstantial differences" approach and the "triple identity test." 520 U.S. at 39. The "insubstantial differences" test looks to whether the element asserted to be an equivalent in the accused device is insubstantially different from the claimed element. *Id.* Under the "insubstantial differences" approach, courts have noted that a "fundamental difference between the accused systems and the claimed invention that goes to the heart of the claimed invention" may preclude a finding of equivalence. *Tech. Patents LLC*

13

*v. T–Mobile (UK) Ltd.*, 700 F.3d 482, 500 (Fed. Cir. 2012). The "triple identity test" focuses on: (1) the function served by a particular claim element; (2) the way that element serves that function; and (3) the result thus obtained by that element. *Warner–Jenkinson Co.*, 520 U.S. at 39.

Raffel relies on the opinion of its expert, Kemnitzer, that the flange of the accused product infringes under the doctrine of equivalents. (Kemnitzer Expert Report at ¶¶ 30, 32.) But Kemnitzer does nothing more than make conclusory statements that the difference between the two flanges is insubstantial and that the flange of the accused product would meet the function-way-result test. (*Id.*) Man Wah's expert, on the other hand, specifically opines that the structural difference between a removable and non-removable flange is functionally significant:

> In my opinion, the structural differences between Man Wah's removable flange and a non-removable flange are substantial. Having a removable and interchangeable flange allows manufacturers or users to customize the look of the cup holder to better fit with the exterior of the seating unit, without compromising the cup holder body structure. Manufacturers or users may choose to have a flange made of different materials or colors. Additionally, the removable flange element in the Accused ICH Products provides more flexibilities such as different types of control switches, different button symbols or functions, and dimpled switches. It is much easier and cheaper to manufacture such a flange including dimpled switches as a separate piece, without the cup holder body, and thus this is a substantially different solution and result than claimed by the Asserted Flange Claims.

(Ricca Expert Report ¶ 52.) I find that the flange of the accused cup holders does not infringe Raffel's patent under the doctrine of equivalents. The record evidence shows that the flange of the accused cup holder serves a significantly different purpose than the flange of Raffel's cup holders. While Raffel's flange simply serves as a place for the controls, the accused cup holder's removable flange allows for interchangeability and customization. As such, the

14

flange of the accused cup holder is substantially different from that of Raffel's. Furthermore, the two flanges do not perform the same function, in the same way, to achieve the same result; thus, the accused cup holders do not infringe under the triple identity test.[5]

Thus, because the "flange" element is not infringed by the accused cup holders, Raffel's claims for infringement as to independent claims 1 and 8 (and their dependent claims) of the '505 Patent; independent claim 1 (and its dependent claims) of the '882 Patent; independent claims 1 and 10 (and their dependent claims) of the '603 Patent; and independent claim 9 (and its dependent claims) of the '968 Patent fail as a matter of law. Man Wah's counterclaims for non-infringement of these claims are granted.

### 1.4    Lighted Element Connected to Light Source

Independent claims 1 and 6 of the '293 Patent contain the requirement of an elongated lighted element that is "attached" to the light source. In Figure 3 of the '293 Patent, 120 represents a light producing light source and 122 represents the lighted element. ('293 Patent col.4 l.61–67.) Man Wah argues that the accused products do not infringe claim 1 of the '293 Patent because the claim requires a lighted element that comprises an elongated member of translucent material having the light source attached thereto; while the two variants of the accused products each have a lighted element that is physically separate from the light source, rather than being fastened or joined to the light source. (Defs.' Br. in Opp at 20–21.) Raffel

---

[5] On April 23, 2021, Man Wah submitted a video allegedly showing Ricca disassembling a cupholder, purportedly to demonstrate that the accused cupholders were "easily reassembled." (Pl.'s Mot. to Strike at 1, Docket # 338-1.) Raffel moved to strike this video evidence and all arguments Man Wah made relying on it in opposition to Raffel's motion for partial summary judgment. (*Id.*) Because I did not find it necessary to consider this video in deciding the infringement issue, Raffel's motion to strike (Docket # 338) is denied as moot.

counters that the light source of the accused products *is* connected to the lighted element. (Pl.'s Reply Br. in Supp. of Summ. Judg. at 8–10, Docket # 336.)

### 1.4.1   Literal Infringement

The parties dispute whether the light source of Man Wah's accused products is "attached" to the lighted element. A photograph of the accused product is shown below (with annotations from Ricca) allegedly demonstrating that the lighted element is not attached to the light source.



(PPFOF ¶ 84 and Defs.' Resp. ¶ 84.) Ricca opined that the accused cupholders do not have an attached lighted element because the lighted element (as labeled above) is separated from the light source (under the plastic cover) by a gap of approximately 7 mm in width. (Ricca Expert Report at ¶ 53.) Raffel counters that Ricca testified, however, that the light source *is* connected to the light element in one of two ways. First, by double-sided tape attached to the bottom of the circuit board and then attached to the little pocket of the cup holder (Ricca Dep. at 81) or second, by "a little plastic, translucent cap that just kind of got jammed up there, and everything was just touching in close proximity by being trapped in there when it was assembled" (*id.* at 46–47).

16

Although Raffel disputes that a gap exists between the lighted element and the light source in the accused cupholder, even assuming no direct contact, the accused cupholder literally infringes Raffel's patent. Considering again Figure 3 of the '293 Patent, the "lighted element" (122) is "operatively connected" to the light source (120) in order to receive light from the light source and illuminate the receptacle. The use of the term "operatively connected" is important. The word "operative," when used as an adjective, can mean "exerting force or influence." Merriam-Webster Online Dictionary. Thus, the "connection" between the lighted element and the light source is one in which the light source exerts "force or influence" over the lighted element—specifically, by receiving light from the light source to illuminate the receptacle. The claim further states that the light source is "attached" to the lighted element. "[T]he ordinary meaning of 'attached' includes both direct and indirect attachment." *Southco, Inc. v. Fivetech Tech. Inc.*, 611 F. App'x 681, 686 (Fed. Cir. 2015). Given the patent's use of both "attached" and "operatively connected," it is clear the nature of the attachment is one of which the light source exerts influence over the lighted element, i.e., by causing it to illuminate the receptacle. It does not mean that the light source needs to be physically touching the lighted element.

Thus, the alleged 7 mm gap between the lighted element—which, like Raffel's, is an "elongated member of translucent material"—and the light source does not save the accused product. The light source of the accused product, though encapsulated in plastic, is "attached" to the lighted element in that it also causes the lighted element to illuminate the receptacle. Thus, I find that the requirement of a light source "attached" to the light element is found in Man Wah's accused product. Recall, though, to find infringement, an accused product must

contain all claimed limitations. *See Amgen Inc.*, 580 F.3d at 1374. Independent claims 1 and 6 contain the "attached" requirement, but not the flange requirement (which is added in dependent claims 10 and 12.) Because I found the "flange" was not found in the accused products, Man Wah's cup holders do not infringe claims 10 and 12 of the '293 Patent because the accused products are missing an element of the claim (i.e., the "flange."). However, because independent claims 1 and 6 do *not* contain the "flange" requirement and I find the accused products infringe the contested "attached" requirement, I will grant summary judgment in Raffel's favor as to its infringement claim on claims 1 and 6 of the '293 Patent.

### 1.5 Summary of Rulings on Utility Patent Infringement

Summary judgment is granted in favor of Man Wah on all of Raffel's patent infringement claims except for Raffel's claim of infringement as to claims 1 and 6 of the '293 Patent.[6] Summary judgment is granted in Raffel's favor as to claims 1 and 6 of the '293 Patent.[7]

### 2. *False Marking*

Raffel alleges a false marking claim under 35 U.S.C. § 292 when Man Wah allegedly marked their accused products with Raffel's patent numbers, labels, and inspection stickers in an attempt to deceive the public into believing that the accused products either belonged to Raffel or were sold with Raffel's consent. (Fourth Am. Compl., Claim 1, ¶¶ 138–47.) The Patent Act prohibits the "mark[ing] upon, or affix[ing] to, or us[ing] in advertising in

---

[6] Man Wah also counterclaimed for declaratory judgment that the '293 Patent did not infringe Man Wah's ICH-type cup holders. (Counterclaim I, Docket # 193.) Given my ruling on Raffel's summary judgment motion regarding the '293 Patent, Man Wah's Counterclaim I is denied.

[7] Man Wah also moves to exclude the expert opinion of Richard Conroy regarding damages for the alleged infringement of the '603 Patent and the '968 Patent. (Docket # 297.) Given my finding of non-infringement, the *Daubert* motion is denied as moot.

connection with" any article, the "name or any imitation of the name of the patentee, the

patent number, or the words 'patent,' 'patentee,' or the like, with the intent of counterfeiting

or imitating the mark of the patentee, or of deceiving the public and inducing them to believe

that the thing was made, offered for sale, sold, or imported into the United States by or with

the consent of the patentee." 35 U.S.C. § 292(a).[8] In order to sue under the false marking

statute, a plaintiff must have "suffered a competitive injury as a result of a violation" of the

marking statute. *Id.* § 292(b). A "competitive injury" is defined as:

> "[a] wrongful economic loss caused by a commercial rival, such as the loss of
> sales due to unfair competition; a disadvantage in a plaintiff's ability to compete
> with a defendant, caused by the defendant's unfair competition." *Sukumar v.
> Nautilus, Inc.*, 785 F.3d 1396, 1400 (Fed. Cir. 2015) (alteration in original)
> (quoting Competitive Injury, Black's Law Dictionary (9th ed. 2009)). In the
> false-marking context, the injury must be one inflicted on a firm's competitive
> activity, caused by the false marking. *Id.* at 1402; *see id.* at 1400 n.3.

*Gravelle v. Kaba Ilco Corp.*, 684 F. App'x 974, 978 (Fed. Cir. 2017). Man Wah argues that

Raffel's false marketing claim fails because Raffel has not suffered any competitive injury as

a result of Man Wah's actions and even if it has, it has failed to show a causal link between

the competitive injury and the alleged false marking (Defs.' Br. in Opp. at 11–15; Defs.' Reply

Br. in Supp. at 1–3), and because Man Wah did not intend to deceive the public (Defs.' Br. in

Opp. at 11–15).

I find Raffel has put forth sufficient evidence of its false marking claim to take the issue

to a jury. As to Man Wah's intent to deceive, it is undisputed that at least *some* of the accused

---

[8] Man Wah seeks summary judgment in its favor to the extent Raffel seeks statutory damages under § 292(a). (Man Wah's Reply Br. in Supp. of Summ. Judg. at 1, Docket # 341-1.) Section 292(a) clearly states that "[o]nly the United States may sue for the penalty authorized by this subsection." Thus, Raffel cannot request statutory relief under § 292(a). (*See* Fourth Am. Compl. at ¶ 147.)

19

cup holders bore a label identifying Raffel's patent numbers. (*See* PPFOF ¶¶ 32–39 and Defs.' Resp. ¶¶ 32–39.) Raffel has put forth evidence that it was contacted by multiple vendors regarding defective cup holders that were actually manufactured by Man Wah. (PPFOF ¶ 30–31.) While Man Wah asserts that the stickers on the cup holders were embedded in the furniture and thus were not visible to the public (and thus could not deceive them) (Defs.' Br. in Opp. at 12–15), and denies that it instructed any of its manufacturers to mark the accused cup holders with Raffel's patent numbers (Defs.' Resp. to PPFOF ¶¶ 35–39), a reasonable jury could conclude that Man Wah placed Raffel's patent numbers on the accused cup holders with the intent to deceive the public into believing that the accused products either belonged to Raffel or were sold with Raffel's consent.

As to the alleged damages, Raffel has presented sufficient evidence in the form of the report of its damages expert, Richard Conroy, for the claim to survive summary judgment. (Pl.'s Br. in Opp at 2, Docket # 319-1.)[9] Conroy opines that Raffel lost profits in the amount of $360,381.00 "due to Man Wah's infringement and false marking of the accused black cup holders." (Declaration of Clark Bakewell in Supp. of Defs.' Mot. for Summ. Judg. ¶ 3, Ex. 2, July 22, 2020 Expert Report of Richard M. Conroy at ¶ 167–72 and Tab. 12, Docket # 299-2.)[10] While Man Wah argues Conroy's report lacks a causal link between the false marking and the lost profit damages (Defs.' Reply Br. at 3), I disagree. Conroy states that his report quantifies Raffel's lost profit due to Man Wah's false marking. (Conroy Expert Report at Tab.

---

[9] Man Wah moves to exclude Conroy's expert opinions regarding damages for infringement of the '603 Patent and the '968 Patent. (Docket # 297.) Man Wah's motion, however, does not specifically relate to Conroy's opinion regarding damages for false marking.
[10] Conroy also calculates an award of statutory damages in his expert report. (*See* Conroy Expert Report at ¶ 171 and Tab. 12.) Again, Raffel is not entitled to statutory damages under § 292(a).

12.) A jury can determine whether to accept Raffel's evidence of a causal connection. As such, both parties' motions for summary judgment are denied as to Raffel's false marking claim.

### 3. *Trade Dress Claims*

Raffel has alleged multiple claims predicated on a finding of trade dress infringement relating to the ICH cup holders. *See* Claim III (trade dress infringement), Claim IV (unfair competition predicated on trade dress infringement), Claim V (trade dress dilution), Claim VII (common law misappropriation predicated on trade dress infringement), and Claim VIII (unjust enrichment predicated on trade dress infringement).[11] Man Wah argues that Raffel cannot meet its burden to show trade dress infringement; thus, summary judgment should be granted in its favor as to claim three, and as to the three claims predicated on claim three—claims four, seven, and eight. (Defs.' Br. in Supp. of Summ. Judg. at 5–12, Docket # 195-2.) As to these claims, Man Wah argues that Raffel's alleged trade dress lacks distinctiveness and sufficient definition. (*Id.* at 5.) As to Raffel's claim five, trade dress dilution, Man Wah argues that this claim fails because Raffel's trade dress is not famous.

### 3.1 Applicable Law

"The 'trade dress' of a product is essentially its total image and overall appearance." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992) (internal citation and quotation omitted). "It . . . may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* In trade dress

---

[11] Man Wah also moves for summary judgment that Raffel is not entitled to statutory damages under 15 U.S.C. § 1117(c) for alleged trade dress infringement. (Defs.' Br. in Supp. of Summ. Judg. at 4–5, Docket # 195-2.) Raffel states that although its damages expert calculated statutory damages for this claim, Raffel is not pursuing statutory damages for trade dress infringement. (Pl.'s Br. in Opp. at 4, Docket # 319-1.) Thus, Man Wah's motion for summary judgment as to Raffel's claim for statutory damages is granted.

actions, a plaintiff must "articulate the specific elements which comprise its distinctive dress . . . This enhanced burden is meant to avoid exceedingly general claims that seek coverage for something that is unprotectable." *Forest River, Inc. v. Winnebago Indus., Inc.*, No. 3:15-CV-609 RLM-MGG, 2017 WL 590245, at *2 (N.D. Ind. Feb. 14, 2017) (internal quotations and citations omitted). Then, to prevail on a claim of trade dress infringement, a plaintiff must show that (1) its trade dress is either inherently distinctive or has acquired secondary meaning, and (2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). If the plaintiff successfully establishes these elements, the defendant can prevail if the defendant demonstrates that the plaintiff's trade dress is functional. *Id.*

Federal law also provides an avenue for relief for owners of a "famous mark," allowing damages for the dilution of the mark regardless of the presence or absence of actual or likely confusion, competition, or actual economic injury. 15 U.S.C. § 1125(c)(1). A mark is famous under the statute if "it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* § 1125(c)(2)(A). A "famous mark" is one that has become a "household name." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012). I will address each argument in turn.

22

### 3.2  Trade Dress Infringement Claims (Raffel's Claims Three, Four, Seven, and Eight)

As stated above, Man Wah challenges Raffel's trade dress claims as lacking specificity and distinctiveness.

#### 3.2.1  Specificity

In April 2019, Man Wah moved for judgment on the pleadings as to Raffel's trade dress infringement claim, arguing that Raffel's amended complaint failed to specify precisely what it believes makes its products entitled to trade dress protection, instead, simply listing a few model numbers for its products with no details showing what about the products entitled them to trade dress protection. (Docket # 67.) On May 22, 2019, Magistrate Judge David E. Jones denied Man Wah's motion without prejudice and allowed Raffel to file a second amended complaint. (Docket # 74.) Man Wah argues that Raffel has failed, through submission of expert reports, to adequately define its alleged trade dress and thus Raffel's trade dress claims fail. (Docket # 295-2.) Man Wah argues that Raffel's expert, Kemnitzer, lists various elements of the ICH cup holder, stating that each could be considered trade dress, thus creating "31 potential trade dress definitions" impossible to lock down. (Defs.' Proposed Findings of Fact ¶¶ 11–12, Docket # 295-3.)

Man Wah relies principally on the district court's decision in *Forest River, Inc.* in support of its argument. In *Forest River, Inc.*, the court addressed whether a trade dress claim contained sufficient specificity at the motion to dismiss stage. The trade dress at issue was plaintiff's "RPOD" travel trailer and defendant Winnebago's "DROP" travel trailer. 2017 WL 590245, at *1. The factual allegations related to plaintiff's trade dress claims were as follows: "Forest River's trade dress is defined to include, 'the size, shape and color of the

23

travel trailers' sold under the trademark 'RPOD,' including 'the exterior shape, the total visual image, the interior layout, interior fabric patterns and colors, and model numbers.'" *Id.* at *2. The complaint further pled that plaintiff's trade dress had "'distinctive characteristics, including features such as size, shape, and color' that are used by consumers 'to identify and distinguish [Forest River's travel trailers] from products offered by other companies.'" *Id.* The court found plaintiff's complaint insufficient because trade dress must be identified and described in some detail and the terms employed by plaintiff in the definition of its trade dress—"unique," "distinct," "decorative"—said nothing about the "size, shape, and color" of the RPOD travel trailers. *Id.* The court found that the "'the discrete elements which make up that combination should be separated out and identified in a list.'" *Id.* (quoting *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 634 (6th Cir. 2002)).

I find that Raffel has articulated its alleged trade dress with sufficient specificity. In Kemnitzer's expert report, he describes Raffel's trade dress as consisting of several specific elements making its trade dress unique:

- the silver color of the interior and exterior of the cup holder in combination with the black color of the rim at the top of the cup holder;
- the elongated C-shaped extension of the rim that is approximately one-third the circumference of the rim and approximately double the width of the rim at the location of the C-shaped extension;
- five circular dimples evenly spaced within the elongated C-shaped extension of the rim;
- icons within the dimples; and
- labels on the bottom exterior portion of the cup holder that are of a specific design, shape, position, size and color that include text of a certain font, color and size that include model number, purchase order and date codes, and U.S. Patent Numbers.

Case 2:18-cv-01765-NJ   Filed 11/05/21   Page 24 of 54   Document 361

(Kemnitzer Expert Report at ¶ 101.) This is a far cry from the articulation of "trade dress" in *Forest River, Inc.* as "distinctive characteristics" such as "color." Rather, Raffel's expert specifically describes the elements that make Raffel's alleged trade dress unique. Thus, Man Wah is not entitled to summary judgment as to this aspect of Raffel's trade dress infringement claims.

### 3.2.2   Distinctiveness

Man Wah also challenges Raffel's alleged trade dress claim on the grounds that the trade dress lacks distinctiveness. Again, trade dress is only protectible if it is distinctive, and distinctiveness can be shown if the trade dress is "inherently distinctive" or has acquired "secondary meaning." *Thomas & Betts Corp.*, 138 F.3d at 291. Raffel does not assert that its trade dress is inherently distinctive. (*See* Pl.'s Br. in Opp. at 5–7, Docket # 319-1.) Rather, Raffel argues that a question of fact exists as to whether its trade dress has acquired secondary meaning. (*Id.*)

Secondary meaning, also called acquired distinctiveness, is a mental association in consumers' minds between the appearance of the product and the product's source. *S.A.M. Elecs., Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1083 (N.D. Ill. 1999); *see also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992) (stating that secondary meaning is "a mental association in buyers' minds between the alleged mark and a single source of the product"); *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010) (defining "secondary meaning" as "a link in the minds of consumers between the marked item and its source"). "Secondary meaning is described as a showing that the primary significance in the minds of the consuming public is not the product but the producer." *Pride Communications Ltd.*

25

*Partnership v. WCKG, Inc.*, 851 F. Supp. 895, 901 (N.D. Ill. 1994). Secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and proof of intentional copying. *Spraying Sys. Co.*, 975 F.2d at 393. "The most direct form of evidence of secondary meaning is consumer testimony or surveys." *S.A.M. Elecs.*, 39 F. Supp. 2d at 1083.

Raffel cites to its expert report (which relies significantly on Stangl's deposition testimony), as evidence that its trade dress has acquired secondary meaning. (Kemnitzer Expert Report at ¶¶ 106–19.) Raffel points to the following evidence of secondary meaning:

- Raffel has used its trade dress since 2010;
- Raffel has expended significant sums in marketing its trade dress;
- Raffel is well-known and respected in the cup holder marketplace and essentially created the market for lighted cup holders;
- Raffel has had significant sales of the ICH Products throughout the United States and are the essential components in many top-selling motion furniture pieces over the last eight years;
- Raffel's cup holders have prominent, distinctive, and non-functional features that differentiates its cup holders from its competitors and identifies the origins of the cup holder to consumers;
- Since introducing its lighted cup holder in 2009, several other manufacturers have introduced competitive lighted cup holders;
- There was evidence of consumer confusion between Raffel's cup holders and Man Wah's defective cup holders

At first blush, the evidence Raffel puts forth to show secondary meaning is weak at best. The most direct, and obviously the best, form of evidence of secondary meaning is from consumer testimony or surveys, *see S.A.M. Elecs.*, 39 F. Supp. 2d at 1083, and Raffel has none of those. And while the amount and manner of advertising is evidence of secondary meaning, only if the advertising evidences an attempt to identify the product's features with the product's source. *Id.* at 1084. Kemnitzer's report does not describe what the advertising entailed. Same

26

with Raffel's length and manner of use and place in the market. While Raffel may be a well-known and respected leader in the cup holder marketplace, that does not automatically mean that consumers are associating lighted cup holders with Raffel.

My pause, however, comes with Raffel's evidence that customers contacted Raffel when having issues with Man Wah's products, believing the cup holders originated with Raffel. (Kemnitzer Expert Report at ¶ 117.) Evidence of a competitor attempting to "pass off" its products as another's can be evidence that the product has acquired secondary meaning. *See Thomas & Betts Corp.*, 65 F.3d at 663 ("[T]he defendant's belief that plaintiff's trade dress has acquired secondary meaning—so that his copying will indeed facilitate his passing off—is some evidence that the trade dress actually has acquired secondary meaning."). For this reason, I find that Raffel has put forth sufficient evidence to send its trade dress infringement claim to a jury.

Man Wah's motion for summary judgment as to claims three, four, seven, and eight are denied.

### 3.3 Trade Dress Dilution (Claim Five)

Man Wah moves for summary judgment on Raffel's claim of trade dress dilution, arguing that Raffel has failed to establish the level of fame necessary to succeed on this claim. (Defs.' Br. in Supp. of Summ. Judg. at 12, Docket # 295-2.) Raffel counters that it has adduced sufficient evidence of fame to send the question to a jury. (Pl.'s Br. in Opp. at 10, Docket # 319-1.) The evidence Raffel presents of its trade dress' "fame" is the fact that Raffel has enjoyed significant sales of its cup holders and its product is incorporated into many top-selling furniture products, that consumers were confused as to the origins of Man Wah's

27

product (believing it to be Raffel's), and Stangl's testimony that the cup holder "has contributed to the Raffel name" and made Raffel "well-known universally." (*Id.*)

While Raffel's trade dress certainly does not have the general household recognition of, for example, McDonald's golden arches, when a defendant allegedly uses a mark in the same market as the plaintiff, "fame" can be based on nationwide recognition in a niche market. *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir. 1999). But even limiting the market to that of furniture, the evidence Raffel presents is insufficient to show that its trade dress is famous. The statute lists potentially relevant factors to consider in deciding fame, including: the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; the amount, volume, and geographic extent of sales of goods or services offered under the mark; and the extent of actual recognition of the mark. 15 U.S.C. §1125(c)(2)(A)(i)–(iii). While Raffel argues that it has significant sales, and, in its opinion, is "well-known universally" in the furniture world, this is insufficient evidence to show that its trade dress is famous. As stated above, Raffel points to nothing in its advertising showing its trade dress was touted, nor does it provide any evidence of actual broad recognition of the trade dress. For these reasons, summary judgment is granted in Man Wah's favor as to count five of Raffel's Fourth Amendment Complaint. This claim is dismissed.

### 3.4    Summary of Remaining Trade Dress Claims

To repeat, summary judgment is granted in Man Wah's favor as to Raffel's trade dress dilution claim. Count Five is dismissed. However, Man Wah's motion for summary judgment as to Counts Three, Four, Seven, and Eight is denied and these counts remain for trial.

28

*4.      Whether the '986 Patent is Invalid Due to On-Sale Bar*

Raffel sues Man Wah for infringement of its U.S. Patent No. D821,986 ("the '986

patent"). (Docket # 108 at 50–51, ¶¶ 241.) Man Wah counterclaimed seeking a declaration of

invalidity and unenforceability of the '986 patent (Docket # 103 at 43, ¶¶ 81–85), pursuant to

35 U.S.C. § 102(a)(1), the on-sale bar. I previously stayed the litigation as to this claim as the

issue was being litigated before the Patent Trial and Appeal Board ("PTAB"). (Docket # 314.)

Raffel acknowledged that an invalidity decision on grounds in parallel PTO proceedings are

binding in concurrent infringement litigation. (Docket # 304 at ¶¶ 13–16.)

During the pendency of the summary judgment briefing, the PTAB rendered a

decision finding the '986 patent unpatentable under the on-sale bar. (Docket # 345-1.) As this

decision is binding on this Court, *see Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330,

1340 (Fed. Cir. 2013) ("[W]hen a claim is cancelled, the patentee loses any cause of action

based on that claim, and any pending litigation in which the claims are asserted becomes

moot."), I will grant Man Wah's motion for summary judgment and dismiss this claim.

*5.      Declaratory Judgment Claims – Raffel's Motion for Partial Judgment on the Pleadings
          (Docket # 287)*

During the pendency of this litigation, Man Wah redesigned its accused cup holders

and presented them to Raffel (hereinafter referred to as the "New Cup Holders"). (Docket #

103 at ¶ 61.) Raffel responded by sending a letter dated July 30, 2019, informing Man Wah

that the New Cup Holders allegedly infringed certain of Raffel's patents, specifically, the '505

Patent, the '882 Patent, the '968 Patent, and the '603 Patent. (*Id.*) Soon thereafter, on

September 20, 2019, Man Wah filed its third amended answer and sought declarations that

the New Cup Holders do not infringe the patents-in-suit. (Docket # 103 at ¶¶ 60–80.) Raffel,

for its part, has never alleged (in court) that the New Cup Holders infringe its patents, despite subsequently filing a Fourth Amendment Complaint. (Docket # 108.) Man Wah, however, continues its counterclaims for declaratory judgment. (Docket # 193.) Specifically, Man Wah seeks a declaration that its New Cup Holders do not infringe the '252 Patent, the '293 Patent, the '505 Patent, the '882 Patent, the '968 Patent, and the '603 Patent. (Counterclaims XV–XXI[12]). Raffel has filed a motion for judgment on the pleadings as to the "New Cup Holder" counterclaims (Docket # 287), which it argues will resolve Man Wah's summary judgment motion as to those counterclaims (Pl.'s Br. in Opp at 11). Raffel argues that because it is not pursuing infringement claims against the New Cup Holders, there is no live controversy for the Court to adjudicate.

### 5.1    Applicable Law

A motion for judgment on the pleadings under Rule 12(c) is granted "only if 'it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.'" *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (internal citations omitted). The moving party should be "clearly entitled to judgment." *Edmonds v. United States*, 148 F. Supp. 185, 186 (E.D. Wis. 1957). In order to succeed, "the moving party must demonstrate that there are no material issues of fact to be resolved." *Northern Indiana Gun & Outdoor Shows, Inc.*, 163 F.3d at 452. Further, the complaint must be construed in the manner most favorable to the nonmoving party. *Id.* (citing *GATX Leasing Corp. v. National Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995)). A motion for

---

[12] Counterclaim XXI seeks a declaration of invalidity as to the '986 Patent. This counterclaim is now moot given the finding of the PTAB.

judgment on the pleadings under Fed. R. Civ. P. 12(c) is decided in the same manner as a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Id.* In determining if the complaint is sufficient, the court looks only to the pleadings, which include "the complaint, the answer, and any written instruments attached as exhibits." *Id.* (internal citations omitted).

The counterclaims subject to Raffel's motion are claims for declaratory judgment. It is well-established that, in patent cases, the existence of a "case or controversy must be evaluated on a claim-by-claim basis." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1281–82 (Fed. Cir. 2012). A party claiming declaratory judgment jurisdiction has the burden of showing "that the facts alleged, 'under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (internal citations omitted).

### 5.2 Analysis

Raffel contends that because it has not pursued infringement claims against the New Cup Holders, there is no live case or controversy for the Court to decide. (Pl.'s Br. in Supp. of Judg. on Pleadings at 5–6, Docket # 287.) Man Wah counters that Raffel's allegations of infringement are open-ended, and thus Man Wah faces a clear threat of litigation as to these new cup holders without a declaratory judgment finding. (Defs.' Br. in Opp. to Judg. on Pleadings, Docket # 307.)

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "The purpose of the Declaratory Judgment Act, as the Supreme Court has explained, is to ameliorate the dilemma posed by 'putting the challenger to the choice between abandoning his rights or risking prosecution.'" *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 787 F. App'x 691, 698 (Fed. Cir. 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007)). The Federal Circuit has found that "declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380–81 (Fed. Cir. 2007). Generally, an affirmative act by the patentee is "conduct that can be reasonably inferred as demonstrating intent to enforce a patent." *Hewlett–Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009).

Raffel contends that although it initially alerted Man Wah about its potential infringement of its "intellectual property" and stated that it did not object to Man Wah filing counterclaims for declaratory judgment, it never actually pursued any of its claims, despite filing a Fourth Amendment Complaint. (Pl.'s Br. in Opp. at 11, Docket # 319-1.) Raffel further argues that it has refused to enter into a covenant not to sue with Man Wah regarding these New Cup Holders because the agreement Man Wah presented was overbroad and "would have immunized Man Wah from future infringement of Raffel's intellectual property rights, including intellectual property not asserted in this case." (*Id.* at 11–12.)

But Man Wah's present situation is exactly the "sad and saddening scenario" that "led to enactment of the Declaratory Judgment Act":

32

In the patent version of that scenario, a patent owner engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword. Guerrilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity. Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.

*Hewlett-Packard Co.*, 587 F.3d at 1362 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734–35 (Fed. Cir. 1988)) (quotations and citations omitted). As was its right, Raffel has a clear history of defending its patents, specifically against Man Wah related to its cup holders. *See Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008) ("Prior litigious conduct is one circumstance to be considered in assessing whether the totality of circumstances creates an actual controversy."). Raffel sent Man Wah a letter specifically contending that the New Cup Holders infringe Raffel's "intellectual property," including its patents, specifically the '505 Patent, the '882 Patent, the '968 Patent, and the '603 Patent, "several of which are at issue in Case 18-CV-1765." (Declaration of Clark Bakewell at ¶ 25, Ex. 24, Docket # 299-24.) Raffel included in its letter a photograph of the accused cup holder and stated examples of how it infringed various of its patent claims. (*Id.*)

Given these facts, while Raffel may not be pursuing an infringement claim as to Man Wah's New Cup Holders in *this* lawsuit, that does not mean that it will not likely happen in the future, especially given Raffel's assertion that it would not enter into a covenant not to sue because it "would have immunized Man Wah from future infringement of Raffel's intellectual property rights, including intellectual property not asserted in this case." The facts

33

of this case sufficiently show a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. As such, Raffel's motion for judgment on the pleadings is denied.

Turning to the merits of Man Wah's declaratory judgment counterclaims, Man Wah seeks a declaration of non-infringement as to the New Cup Holders infringing the '252 Patent, the '293 Patent, the '505 Patent, the '882 Patent, the '968 Patent, and the '603 Patent. Man Wah argues that Raffel "has done nothing to prove infringement and cannot now carry its burden of proof." (Defs.' Br. in Supp. of Summ. Judg. at 18, Docket # 295-2.) Man Wah is correct. Raffel makes no arguments whatsoever that Man Wah's New Cup Holders infringe its patents. Although Man Wah brings the declaratory judgment claim, the Supreme Court in *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 194 (2014) explicitly declined to shift the burden of proving infringement from the patentee to the declaratory judgment plaintiff. As the purpose of the Declaratory Judgment Act, specifically with respect to patents, is to allow potential producers of a product to know whether their potential product infringes, shifting the burden of infringement to the declaratory judgment plaintiff would frustrate that purpose:

> To shift the burden depending upon the form of the action could create postlitigation uncertainty about the scope of the patent. Suppose the evidence is inconclusive, and an alleged infringer loses his declaratory judgment action because he failed to prove noninfringement. The alleged infringer, or others, might continue to engage in the same allegedly infringing behavior, leaving it to the patentee to bring an infringement action. If the burden shifts, the patentee might *lose* that action because, the evidence being inconclusive, he failed to prove infringement. So, both sides might lose as to infringement, leaving the infringement question undecided, creating uncertainty among the parties and others who seek to know just what products and processes they are free to use.

*Id.* at 199–200. As such, the burden of infringement remains with Raffel as to Man Wah's New Cup Holders. Raffel clearly had, at least a general argument, as to how it believed Man Wah's new products infringed its patents, as it articulated specific claim numbers in its July 2019 letter. But Raffel chose to mount no defense to the merits of Man Wah's counterclaims, relying solely on its jurisdictional argument. Unfortunately, Raffel's strategy worked to its detriment in this case. Because Raffel has failed to show how Man Wah's New Cup Holders infringe its patents, summary judgment is granted in Man Wah's favor as to its Counterclaims XV–XX. *See Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) ("Since the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case."). Declaratory judgment is entered finding that the New Cup Holders do not infringe the '252 Patent, the '293 Patent, the '505 Patent, the '882 Patent, the '968 Patent, and the '603 Patent.

### 6. Design Patent Infringement

Raffel also alleges that Man Wah's ICH cup holders infringe its design patent, the '252 Patent, which covers the ornamental design of the cup holders. Man Wah counterclaims for a declaration of noninfringement of the '252 Patent (Counterclaim IX, Docket # 193) and moves for summary judgment on its counterclaim.

35

### 6.1    Applicable Law

A design patent is infringed "[i]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015) (internal quotations and citations omitted). As with utility patents, the patentee must prove infringement of a design patent by a preponderance of the evidence. *Id.* "Where the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar,' the patentee fails to meet its burden of proving infringement as a matter of law." *Id.* (citation omitted). If the claimed and accused designs are not plainly dissimilar, the inquiry may benefit from comparing the claimed and accused designs with prior art to identify differences that are not noticeable in the abstract but would be significant to the hypothetical ordinary observer familiar with the prior art. *Id.* The ordinary observer is not an expert in the claimed designs, but one of "ordinary acuteness" who is a "principal purchaser[ ]" of the underlying articles with the claimed designs. *Id.* at 1337.

Differences must be evaluated in the context of the claimed design as a whole, and not in the context of separate elements in isolation. *Id.* at 1335. Where the claimed design includes several elements, the fact finder must apply the ordinary observer test by comparing similarities in overall designs, not similarities of ornamental features in isolation. *Id.* An element-by-element comparison, untethered from application of the ordinary observer inquiry to the overall design, is procedural error. *Id.*

36

6.2    Analysis

During the claim construction phase of this litigation, I construed the '252 Patent claims as: "The ornamental aspects or features of a cup holder depicted in FIGS. 1–8." (Docket # 190 at 20.) Both parties have submitted conflicting expert reports as to whether Man Wah's cup holders infringe the '252 Patent. (*See* Kemnitzer Expert Report at ¶¶ 68–96; Declaration of Alan Ball ¶ 5, Ex. B, Rebuttal Ball Expert Report, Docket # 298-2.)

Man Wah's principal argument is that the accused ICH cup holders have dimples on the flange (picture on right) whereas the design depicted in the '252 Patent does not (picture on left). (DPFOF ¶ 50, Docket # 295-3.)



| Fig. 1 | Accused Cup Holder |

(Kemnitzer Expert Report at ¶ 76.) Man Wah argues that the use of solid black lines (as opposed to broken lines) and surface shading indicates a specific, narrow ornamental cup holder design consisting of a smooth top surface on the extended flange without any dimples or depressions. (Defs.' Br. in Supp. of Summ. Judg. at 23 quoting *In re Maatita*, 900 F.3d 1369, 1372 (Fed. Cir. 2018) ("As is customary, the solid lines of Figure 1 show the claimed design,

Case 2:18-cv-01765-NJ   Filed 11/05/21   Page 37 of 54   Document 361

whereas the broken lines show structure that is not part of the claimed design.") and 37 C.F.R. § 1.152 ("Appropriate and adequate surface shading should be used to show the character or contour of the surfaces represented.").) Man Wah argues that in the eyes of the ordinary observer—which the parties generally agree would be a consumer purchasing a powered seating arrangement with powered, lighted cup holders—the claimed design in the '252 Patent differs substantially from the accused ICH cup holders. (*Id.* at 24.)

In opposing Man Wah's summary judgment motion, Raffel relies primarily on the report of its expert in support of its argument that the "overall appearance of the accused Man Wah products would appear substantially the same as the overall appearance of the D252 Patent design in the eye of an ordinary observer who is familiar with the prior art." (Kemnitzer Expert Report at ¶ 74.) In reaching this conclusion, Kemnitzer performs a side-by-side comparison of each of the figures depicted in the '252 Patent with Man Wah's accused cup holders. Figures 1, 2, and 3 of the '252 Patent all depict a top view of the flange. Kemnitzer notes that both designs have "an upper flange element that is a circular ring with a concentrically extending portion that represents approximately one-third of the circumference of the flange. The top edges of both of these flange elements have a small radiused edge." (*Id.* at ¶ 77.) He further opines, however, that the "only visible difference in this element is the indication of an inscribed line around the perimeter of the extended portion of the flange in the D252 design while the accused product has no such visual detail. In my opinion this visual difference is so minor as to be immaterial to an Ordinary Observer in the overall visual perception of the product." (*Id.*)

38

But this is clearly not the "only visible difference" between the two flanges. Kemnitzer completely fails to address the most significant difference between the two cup holders—the dimpled versus smooth appearance of the flange. In this case, I find there is no genuine dispute of material fact that the claimed and accused designs of the cup holders are plainly dissimilar. Take, for example, the claimed and accused designs at issue in *Ethicon Endo-Surgery, Inc.*:



D'804 patent, Fig. 1          Covidien's accused product

The court found that although the two medical devices were similar at a general conceptual level in that both contained an open trigger, a small activation button, and a fluted torque knob in relatively similar positions, the ornamental features made the designs "plainly dissimilar." 796 F.3d at 1336. Specifically, the court looked at the "most obvious difference" being the "overall contoured shape" of the claimed design and the "overall linear shape" of the accused design. *Id.* Or, the federal circuit's determination in *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1344 (Fed. Cir. 2020), in which it upheld the district court's finding of non-infringement of the following design:

Case 2:18-cv-01765-NJ   Filed 11/05/21   Page 39 of 54   Document 361

 

Fig. 1 '167 patent   Defendant's "Chalk Pencil"

*Lanard Toys Ltd. v. Toys "R" Us-Delaware, Inc.*, No. 3:15-CV-849-J-34PDB, 2019 WL 1304290, at *16 (M.D. Fla. Mar. 21, 2019). The district court found that the distinctions between the patented design and the accused product were "readily apparent," including the "most prominent" feature being the appearance of the ferrules.[13] *Id.* The court found that the "ferrule on the patented design has three horizontal ridges in the center, while the ferrule on the accused design has a series of vertical lines in the center, with two horizontal ridges at the top and bottom of the vertical lines." *Id.* Thus, in this case, given the importance and prominence of the flange, which is undoubtedly the main portion of the cup holder the customers see (as the cup holder is incorporated into furniture), the dimpled versus smooth design of the flange is a significant ornamental difference that makes designs "plainly dissimilar." And where the claimed and accused designs are "sufficiently distinct" and "plainly dissimilar," the patentee fails to meet its burden of proving infringement as a matter of law. *Ethicon Endo-Surgery, Inc.*, 796 F.3d at 1335. For these reasons, Man Wah's motion for summary judgment as to non-infringement of the '252 Patent is granted.[14]

---

[13] A ferrule is a ring or cap, typically a metal one, which strengthens the end of a handle, stick, or tube and prevents it from splitting or wearing.

[14] Man Wah contends that despite the '252 Patent claims construed as the "ornamental aspects or features of a cup holder," Raffel has claimed that the proper article of manufacture for the '252 Patent may be the entire furniture pieces, such as the sofas that include the cup holders, and are thus included to damages equaling the entire profits of those furniture sales. (Defs.' Br. in Supp. of Summ. Judg. at 27, Docket # 295-2.) Man Wah has moved for summary judgment finding that the proper article of manufacture is simply the cup holder. Since, however, defining the proper article of manufacture is the first step in determining a damages award for design patent infringement, *see Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 434 (2016), and summary judgment has

7. *Man Wah's Breach of Contract Counterclaims and Motion to Conduct Limited Discovery (Docket # 316)*

By way of background, in Raffel's Fourth Amended Complaint, it sues Man Wah for breach of contract and breach of the duty of good faith and fair dealing, alleging that Man Wah ordered specific products from Raffel, creating a binding agreement, and Man Wah refused to accept delivery of the products. (Fourth Am. Compl. ¶¶ 222–240, Ex. 20, Docket # 108.) These alleged orders all took place in May 2019. (*Id.*) Raffel alleges that Man Wah refused to accept the products it ordered to pressure Raffel to dismiss its lawsuit against Man Wah. (*Id.* ¶ 231.) Man Wah counterclaimed against Raffel with its own breach of contract, breach of the implied duty of good faith and fair dealing, and a covenant not to sue causes of action, alleging that the parties entered into two supplier contracts with substantially the same terms on January 1, 2016 and January 1, 2017, respectively, and that Raffel breached these contracts by bringing the instant lawsuit (as the contracts contain a provision specifying that "any disputes arising from the execution of the contract or related to the contract should be settled through friendly negotiation between the two parties") and by selling cup holders and switches to third parties when the agreements provided for an exclusive relationship with Man Wah. (Counterclaim XI and XIV, Docket # 193.)

Neither party moves for summary judgment as to Raffel's breach of contract claim, and the specific purchase orders at issue in those claims are not appended to the Fourth Amended Complaint. Raffel does, however, move for summary judgment as to Man Wah's breach of contract counterclaims. (Pl.'s Br. in Supp. of Partial Summ. Judg. at 20–29, Docket

---

been granted on Man Wah's counterclaim for non-infringement of the '252 Patent, this argument is now moot and I need not address it.

# 292-1.) Raffel's principal arguments are that the 2016 agreement expired on December 31, 2016 and was never renewed (and thus there was no valid contract from 2017-2019) and that Raffel was not a party to either of the alleged supplier agreements. (*Id.*) Raffel further argues that even if it was a party to the contracts, Man Wah cannot prove breach. (*Id.*)

Thus, as a threshold matter, I must determine whether Raffel is either a party or otherwise bound to the two supplier contracts that are the subject of Man Wah's counterclaims and whether a valid 2017 agreement exists.

## 7.1    Whether Raffel is Bound by the Supplier Contracts

The record contains a "Supplier Contract" executed on January 1, 2016 (Docket # 133-1) and an additional "Supplier Contract" executed on January 1, 2017 (Declaration of Nancy Cruz, ¶ 28, Ex. 28, Docket # 291-28). On the face of the documents, both agreements are between the "Purchaser," or "Party A," defined as Man Wah Furniture Manufacturing (Huizhou) Co., Ltd., and "Supplier," or "Party B," defined as Xiamen Raffel Electronic Trading Co., Ltd. (Docket # 133-1; Docket # 291-28.) On both contracts, Raffel's president at the time of execution, Paul Stangl, is listed as Xiamen Raffel's "legal representative."

Clearly, on the face of the contract, the plaintiff in this case, Raffel Systems, LLC, is not a party to the contract. The contract was signed by Xiamen Raffel Electronic Trading Co., Ltd. Can, however, Raffel Systems, LLC be bound by the contract? Under Wisconsin law, the mere existence of a parent-subsidiary relationship, by itself, is insufficient to establish that a principal-agent relationship exists between the two entities. *Insolia v. Philip Morris Inc.*, 31 F. Supp. 2d 660, 671 (W.D. Wis. 1998). Where no explicit authorization exists, a court may find so-called implied or apparent agency if the following three elements are established: (1) acts

by the agent or principal justifying belief in the agency; (2) knowledge of these acts by the party sought to be held responsible as a principal or as an agent; and (3) reliance on the existence of the relationship by plaintiffs, consistent with ordinary care and prudence. *Id.* (citing *Schaefer v. Dudarenke*, 89 Wis. 2d 483, 489–490, 278 N.W.2d 844, 847 (1979)).

Raffel argues that Raffel and Xiamen Raffel are separate entities. (Defs.' Proposed Add. Findings of Fact ¶ 18–19, Docket # 328 and Pl.'s Resp. ¶¶ 18–20, Docket # 337.) Raffel contends that Xiamen Raffel has its own employees and that Raffel does not control Xiamen Raffel's day-to-day operations. (*Id.*) There is no question that the relationship between Raffel and Xiamen Raffel is one of parent-subsidiary. Richard Weeden, Raffel's current president who joined Raffel in August 2014 as the operations manager, testified that Xiamen Raffel is a "fully-owned subsidiary" of Raffel and had been since Xiamen Raffel was started approximately three years prior. (Declaration of Clark Bakewell ¶ 6, Ex. E, August 1, 2019 Deposition of Richard Weeden at 8, 12–13, Docket # 325.) Weeden testified that Raffel Systems started Xiamen Raffel to improve Raffel's presence overseas and to provide better customer service. (*Id.* at 13.) Xiamen Raffel does not produce products, but serves as Raffel System's office for customer service and order placement. (*Id.*) Xiamen Raffel has approximately 15 employees. (*Id.*) Paul Stangl, Raffel's president at the time the agreements at issue were executed, similarly testified that Xiamen Raffel is a wholly-owned subsidiary of Raffel Systems. (Declaration of Clark Bakewell ¶ 7, Ex. F, August 2, 2019 Deposition of Paul Stangl at 64, Docket # 325.) When asked about Xiamen Raffel's "officers," Stangl testified that Ben Song was the "general manager," but there were no other officers. (*Id.* at 65.) Stangl

43

testified that Xiamen Raffel had no board of directors and that Raffel Systems generally controlled the major decisions of Xiamen Raffel. (*Id.*)

When asked what type of decision he would consider "major," Stangl testified that day-to-day operating decisions are not "major decisions." (*Id.* at 66.) When questioned about selling cup holders to Man Wah, Stangl testified that the "actual seller" of the product is Xiamen Raffel, not Raffel Systems. (*Id.*) When asked to explain why, Stangl testified:

> That would go to the setup of the Chinese system. Can't sell domestically in China because you can't issue vet certificates unless you're a China entity. So to legally do it, you have to be a China entity.

(*Id.* at 66–67.) Stangl acknowledged, however, that Raffel Systems benefits financially from Xiamen Raffel's sales because of the parent-subsidiary relationship. (*Id.* at 69.)

Given the testimony of Raffel's own employees about the relationship between Raffel and Xiamen Raffel, it is clear that Xiamen Raffel acted on Raffel's behalf. Raffel's president Weeden clearly testified that the sole purpose of Xiamen Raffel was to effectuate Raffel System's sales in China. This is corroborated by Stangl's testimony that under Chinese law, Raffel Systems, as a non-Chinese company, would not be allowed to sell domestically in China, so Xiamen Raffel was created to fulfill that role. Stangl testified that Raffel makes all major decisions concerning Xiamen Raffel, and it is disingenuous at best for Raffel to contend that entering into contracts for sale of products falls under a "day-to-day" operation. Thus, I find the evidence clearly supports that Raffel Systems is bound by the two agreements relevant to Man Wah's counterclaims.

### 7.2 Validity of 2017 Agreement

Raffel contends that even if it is bound by the 2016 Supplier Agreement, the Agreement expired on December 31, 2016; thus, there was no validly executed supplier agreements for 2017-2019. (Pl.'s Br. in Supp. of Partial Summ. Judg. at 22–24, Docket # 292-1.) Raffel argues that after the 2016 contract expired, while negotiations took place for an additional supplier agreement and drafts were exchanged, no final agreement was executed because Man Wah rejected Raffel's proposed amendments. (Pl.'s Br. in Supp. of Partial Summ. Judg. at 22–23.)

In support of its argument, Raffel points to the testimony of several Man Wah employees. For example, Zoe Wong, who served as Man Wah's Deputy General Manager during the relevant time period, testified that she was unsure whether Man Wah signed an additional agreement with Raffel after the first expired. (Cruz Decl. ¶ 3, Ex. 3, Dec. 18, 2019 Deposition of Zoe Wong at 15, 106, Docket # 291-3.) Also, Binghuang Chen, Man Wah's Purchasing Manager, testified that the 2017 contract that he had "in [his] hand" (identified as Exhibit 89) was never signed because Man Wah disagreed with Raffel's proposed amendments. (Cruz Decl. ¶ 8, Ex. 8, Dec. 17, 2019 Deposition of Binghuang Chen at 10, 55–56, Docket # 291-8.) Chen later testified that Exhibit 89 was "a draft supplier agreement that was exchanged between Man Wah and Raffel in 2017." (*Id.* at 80–82.) Finally, Man Wah's Deputy Director of purchasing, Linhua Huang, testified that he was involved in the negotiations related to the 2017 supplier contract and after being shown a draft of the 2017 agreement, testified that Raffel proposed amendments that Man Wah rejected. (Cruz Decl. ¶ 9, Ex. 9, Dec. 19, 2019 Deposition of Linhua Huang at 72–73, Docket # 291-9.) Huang did

45

not testify, however, as Raffel asserts, that the 2017 Supplier Agreement was "not executed because Man Wah rejected Xiamen Raffel's proposed amendments." (PPFOF ¶ 48.)

While I agree that the testimony Raffel puts forth supports that Man Wah rejected some proposed amendments to the 2017 Supplier Agreement, the testimony does not support that no agreement was ever executed. In fact, the record contains an executed agreement, signed by both Man Wah and Xiamen Raffel in January 2017 and affixed with Xiamen Raffel's stamped seal. (Docket # 291-27; 291-28.) Raffel does not contest the authenticity of the document. (*See* PPFOF ¶ 48 and Defs.' Resp. ¶ 48, and Pls.' Reply ¶ 48.) While Raffel asserts that "there is no evidence in the record that Man Wah ever sent back a signed agreement in 2017," (PPFOF ¶ 56), Raffel points to no evidence that it never received the fully executed agreement. In fact, the agreement indicates that Raffel signed the agreement on January 13, 2017, whereas Man Wah signed on January 1, 2017. (Docket # 291-28.) Thus, Raffel would have seen Man Wah's execution of the agreement even before it signed. For these reasons, I find that the record supports the validity of the January 1, 2017 agreement.

### 7.3    Breach of the Agreements

Raffel further moves for summary judgment, arguing that it did not breach the contract, either by failing to negotiate in good faith prior to filing the lawsuit or by breaching the exclusivity provision. (Pl.'s Br. in Supp. of Partial Summ. Judg. at 25–27, Docket # 292-1.)

#### 7.3.1   Dispute Resolution Clause

Both Supplier Agreements contain the following Article 10.4:

Any dispute arising from the performance of or in connection with this contract shall be settled through friendly negotiation between the parties. If the

46

negotiation fails, the matter shall be submitted to the People's Court of
Huizhou Daya Bay Economic and Technological Development Zone for
jurisdiction and settlement through litigation.

(Docket # 133-1 and Docket # 291-28.) Unsurprisingly, the parties dispute whether each

engaged in "friendly negotiations" before suit was filed. But even assuming Raffel did not,

the next step was to file suit in the People's Court of Huizhou Daya Bay Economic and

Technological Development Zone. Raffel does not address Man Wah's argument regarding

its failure to file suit in China. Nor could it. Raffel undoubtedly *did* file its complaint in this

court. It is entirely unclear, however, what damages Man Wah sustained by Raffel's breach

of Article 10.4. Man Wah provides no evidence that had the parties negotiated, a favorable

settlement would have been reached. Nor does Man Wah's expert witness, Thomas R.

Varner, explain what damages flow from this action being venued in the Eastern District of

Wisconsin as opposed to the People's Court of Huizhou Daya Bay Economic and

Technological Development Zone. (Declaration of Thomas R. Varner ¶ 5, Ex. A, Docket #

329.) Without evidence of actual damages related to this breach, Man Wah's breach of

contract counterclaim as to Article 10.4 cannot go forward. *See, e.g., Matthews v. Wisconsin

Energy Corp. Inc.*, 534 F.3d 547, 557 (7th Cir. 2008) ("Even if the delay fell short of Wisconsin

Energy's obligations, Matthews has not shown that this delay damaged her in any way, a

prerequisite to stating a claim for a breach of contract."); *Cent. Brown Cty. Water Auth. v.

Consoer, Townsend, Envirodyne*, No. 09-C-0131, 2013 WL 501419, at *7 (E.D. Wis. Feb. 11,

2013) (stating that a plaintiff must have possible actual damages, as opposed to nominal

damages, to go to trial on a breach of contract claim). As such, summary judgment is granted

to Raffel as to this claim.

47

### 7.3.2 Exclusivity Clause

Both Agreements also contain the following exclusivity clause:

> Exclusiveness for supplier. Without the prior written consent of Party A, Party B shall not sell or provide (or allow any other person or entity to sell or provide) the product hereunder to any third party (including but not limited to Changzhou Xieshou Smart Home Co., Ltd., KUKA HOME Group Co., Ltd. and their affiliated companies) that has or may have a business competition relationship with Party A.

(Docket # 133-1 and Docket # 291-28.) Man Wah contends that Raffel breached this provision by selling its products to Man Wah's competitors. (Defs.' Br. in Opp. at 26–27.) Man Wah cites to the testimony of its president, Guy Ray, that Raffel sold its products to several of Man Wah's competitors, including Southern Motion, Ashley Furniture, and Synergy Home Furnishing. (Defs.' Additional PFOF ¶ 32.) Raffel disputes this testimony, arguing that the supplier agreements list several specific competitors, none of which Raffel is alleged to have sold products to, and that Ray does not specify when the sales were made. (Pl.'s Resp. to Defs.' Additional PFOF ¶ 32.) Raffel further argues that there is no evidence that Xiamen Raffel sold the specific products referenced in Article 2.4. (*Id.*)

As an initial matter, Article 2.4 clearly does not limit the competitors to those listed in the contract, as indicated by the language "including, but not limited to, . . . ." (Docket # 133-1 and Docket # 291-28.) Furthermore, Man Wah has presented evidence in the form of Raffel's sales data showing sales to Southern Motion in 2016 and 2017 (Bakewell Decl. ¶ 18, Ex. Q, Docket # 325-17 at 31) to Ashley Furniture in 2017 (*id.* at 60), and to Synergy Home Furnishings in 2016 (*id.* at 83). Man Wah provided evidence in the form of its damages expert regarding its alleged damages from Raffel's alleged breach of Article 2.4. (Docket # 329.) Thus, I find that Man Wah has presented sufficient evidence for a jury to decide whether

48

Raffel breached Article 2.4 and the damages sustained. Raffel's motion for summary judgment as to this breach of contract counterclaim is denied.

### 7.4 Man Wah's Motion to Conduct Limited Discovery

Man Wah has also filed a motion for leave to conduct limited discovery regarding its breach of contract defenses and counterclaims. (Docket # 316.) Specifically, Man Wah seeks to depose former Xiamen Raffel employees Ben Song and Lucy Zheng regarding the circumstances regarding their departures from Xiamen Raffel, and for Raffel to identify any individuals remaining at Xiamen Raffel with discoverable knowledge regarding Man Wah's contract defense and counterclaims so that Man Wah can depose those individuals. (Docket # 316-1.) Raffel opposes the motion (Docket # 347-1) and the parties spill much ink assigning blame for Man Wah's failure to depose Song and Zheng earlier.

Regarding Man Wah's breach of contract counterclaims and Tenth Affirmative Defense, given my findings on summary judgment, I do not find it necessary to reopen discovery on this issue. Man Wah argues that it wishes to depose Song and Zheng to explore, for example, their first-hand knowledge of the relationship between Xiamen Raffel and Man Wah China, including the negotiation of the 2016 and 2017 Supplier Agreements, the contractual terms therein, and whether and why certain terms or paragraphs were/were not included in either agreement. (Defs.' Br. in Supp. at 15, Docket # 316-1.) But finding that Raffel was bound to the agreement, the 2017 agreement was valid, and that Raffel breached Article 10.4 (albeit with no damages), it is unclear what further information these two witnesses would shed on the remaining breach of contract action as to Article 2.4. Man Wah

Case 2:18-cv-01765-NJ   Filed 11/05/21   Page 49 of 54   Document 361

has testimony regarding who its competitors are and Raffel's sales, as well as its damages expert. No further discovery is necessary.

Finally, while Man Wah asserts that Song has information related to its express/implied license and acquiescence defenses that Man Wah is "entitled to explore via one or more witness having comparable knowledge," (*id.* at 15), Man Wah does not articulate why this particular witness is necessary to further litigate these specific affirmative defenses, much less at this late hour in the case—after summary judgment briefing is complete. For these reasons, Man Wah's motion to conduct limited discovery is denied.

### 8. *Raffel's Motion for Sanctions*

Finally, Raffel submits a 43-page brief detailing Man Wah's alleged infractions committed during the course of this litigation. (Docket # 280.) Raffel principally accuses Man Wah of willfully destroying critical evidence (in the form of samples of Man Wah's allegedly infringing cup holders) and engaging in vexatious litigation tactics, including making material misrepresentations to the Court and to Raffel.

The crux of Raffel's sanctions motion regards the inspection by Man Wah's expert of allegedly infringing cup holders identified by Raffel's expert. Raffel argues that Man Wah requested the cup holders identified in its expert's report so that Man Wah's expert could inspect them. (*Id.* at 5.) Raffel contends that Man Wah's expert, Steven Ricca, intentionally destroyed the cup holders by completely taking them apart and either removing, losing, or breaking several components. (*Id.* at 2–19.) Raffel argues that these samples were the only physical examples Raffel had of Man Wah's allegedly infringing cup holders; thus, they were critical pieces of evidence that substantiate Man Wah's alleged infringement. (*Id.* at 4–5.)

50

Having the physical cup holders, however, was not critical for resolving the infringement claims, which I was able to do through photographs and testimony. Thus, even assuming, *arguendo*, that Ricca did intentionally destroy the cup holder when he was examining it, the lack of the physical cup holder did not impact resolution of the claims.

Raffel also accuses Man Wah of lying to the Court, specifically, by refusing to acknowledge that its products were defective. (*Id.* at 19–27.) Whether Man Wah's cup holders were indeed defective was not a matter before this Court to resolve; thus, it is unclear to me how it impacts the claims in this case.

Raffel also faults Man Wah for "vehemently" objecting to use of the terms "knockoff" or "counterfeit" when Man Wah had internal documents referring to the non-Raffel cupholders as counterfeit. (*Id.* at 27.) But of course Man Wah would object to either opposing counsel or the Court utilizing those terms—whether Man Wah's cup holders infringed Raffel's patents is the very issue the Court was tasked with deciding. Finally, Raffel accuses Man Wah of obstructing depositions, failing to meet and confer in good faith, concealing sales, and concealing copying of Raffel's silver cup holders. (*Id.* at 28–33.) But Raffel already raised these issues with Judge Jones, Ret., acting as Special Master in this case. (*Id.*)

Clearly there is no love lost between the parties after years of litigating this case. But Raffel's sanctions request is unreasonable. It seeks to have judgment entered in its favor on *all* claims, and an award of attorney's fees. (*Id.* at 41.) Even if Man Wah did spoliate critical evidence, that would not warrant judgment in Raffel's favor as to claims completely separate from the infringement issues, such as both parties' breach of contract claims. Raffel's motion for sanctions is denied.

51

## CONCLUSION

As stated above, Raffel brings fifteen causes of action against Man Wah, and Man Wah responds with twenty-eight counterclaims of its own. After thoroughly considering the parties' arguments and the record evidence, the following claims are resolved:

- Infringement of the '252 Patent (Raffel's Second Claim, Man Wah's Nineth Counterclaim). The Court finds in favor of Man Wah.

- Trade Dress Dilution (Raffel's Fifth Claim). The Court finds in favor of Man Wah.

- Infringement of the '505 Patent (Raffel's Tenth Claim, Man Wah's Third Counterclaim). The Court finds in favor of Man Wah.

- Infringement of the '882 Patent (Raffel's Eleventh Claim, Man Wah's Fifth Counterclaim). The Court finds in favor of Man Wah.

- Infringement of the '968 Patent (Raffel's Twelfth Claim, Man Wah's Seventh Counterclaim). The Court finds in favor of Man Wah.

- Infringement of the '603 Patent (Raffel's Sixth Claim, Man Wah's Twelfth Counterclaim). The Court finds in favor of Man Wah.

- Infringement of the '293 Patent (Raffel's Nineth Claim, Man Wah's Second counterclaim). Summary judgment is granted in Raffel's favor as to claims 1 and 6 of the '293 Patent.

- Infringement and Invalidity of the '986 Patent (Raffel's Eleventh Claim, Man Wah's Twenty-First Twenty-Seventh Counterclaim). Claims mooted by decision of PTAB.

- Man Wah's counterclaims for declaratory judgment (Counterclaims 15-20). The Court finds in favor of Man Wah.

The balance of the parties' claims remains for trial. The deputy clerk will contact the parties to set a status conference regarding scheduling the remaining matters for trial.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Docket # 289) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Docket # 295) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Judgment on the Pleadings (Docket # 287) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike (Docket # 338) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Conduct Limited Discovery (Docket # 316) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude the Expert Opinions of Richard Conroy (Docket # 297) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sanctions (Docket # 279) is **DENIED**.

**FINALLY, IT IS ORDERED** that the following motions to seal are **GRANTED**: (Docket Nos. 288, 294, 296, 301, 308, 311, 315, 318, 323, 331, 335, 339, 346, 349, 352, and 354).

Dated at Milwaukee, Wisconsin this 5th day of November, 2021.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge