# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RAFFEL SYSTEMS, LLC,

      Plaintiff,

      v.                         Case No. 18-CV-1765

MAN WAH HOLDINGS LTD, INC.,
MAN WAH (USA) INC., and XYZ
COMPANIES 1-10,

      Defendants.

## DECISION AND ORDER ON THE PARTIES' POST-TRIAL MOTIONS

Introduction ................................................................................................. 3

Legal Standards ........................................................................................... 3

Analysis ......................................................................................................... 5

Man Wah's Post-Trial Motions ................................................................. 5

  1. Trade Dress Infringement ...................................................................... 5

    1.1 Applicable Law .................................................................................. 5

    1.2 Analysis ............................................................................................... 6

      1.2.1 Acquired Distinctiveness .............................................................. 6

      1.2.2 Likelihood of Confusion ............................................................... 9

      1.2.3 Non-Functionality ........................................................................10

        1.2.3.1 Waiver...............................................................................11

        1.2.3.2 Merits ...............................................................................13

    1.3 Damages...............................................................................................14

      1.3.1 Compensatory Damages...............................................................14

      1.3.2 Man Wah's Profits ........................................................................16

      1.3.3 Admission of Conroy's Expert Opinion.........................................18

      1.3.4 The Jury's Finding of Willfulness.................................................18

  2. Common Law Misappropriation.............................................................21

    2.1  The Jury's Verdict on Common Law Misappropriation ....................................21

    2.2  Preemption ........................................................................................................23

    2.3  Compensatory Damages....................................................................................24

    2.4  Punitive Damages .............................................................................................24

  3.  False Marking ...........................................................................................................27

  4.  Patent Infringement ..................................................................................................29

    4.1  Instruction on Obviousness..............................................................................29

    4.2  Instruction on Willfulness................................................................................32

  5.  Duplicate Damages ...................................................................................................35

**Raffel's Post-Trial Motions** ................................................................................................**39**

  1.  Enhanced Damages for Patent and Trade Dress Infringement...................................39

    1.1  Treble Damages for Willful Patent Infringement .............................................39

    1.2  Treble Damages for Trade Dress Infringement  ...............................................43

    1.3  Enhanced Award of Man Wah's Profits............................................................44

  2.  Attorneys' Fees, Prejudgment Interest, and Non-Taxable Costs ...............................45

    2.1  Attorneys' Fees .................................................................................................45

    2.2  Prejudgment Interest ........................................................................................48

    2.3  Non-Taxable Costs............................................................................................49

  3.  Permanent Injunction ...............................................................................................50

    3.1  Irreparable Harm and Inadequate Remedy at Law ..........................................51

    3.2  Balance of Hardship and Public Interest...........................................................53

    3.3  Scope of Permanent Injunction .......................................................................54

**Conclusion** ..........................................................................................................................**54**

Case 2:18-cv-01765-NJ   Filed 05/11/23   Page 2 of 56   Document 500

Following a ten-day jury trial, on June 17, 2022, the jury returned a special verdict awarding damages in favor of the plaintiff, Raffel Systems, LLC, and against the defendants, Man Wah Holdings LTD, Inc. and Man Wah (USA) Inc. (collectively "Man Wah"). (Docket # 439.) Presently before me are post-trial motions from both parties. Man Wah moves for judgment as a matter of law under Fed. R. Civ. P. 50(b) and/or for a new trial under Fed. R. Civ. P. 59(a) as to Raffel's trade dress infringement, common law misappropriation, false marking, and patent infringement claims. (Docket # 466.) Man Wah further moves to reduce or eliminate damages as to these claims. (*Id.*) Raffel requests treble damages on its patent infringement claim, enhanced damages on its trade dress infringement claim, attorneys' fees, prejudgment interest, certain non-taxable costs, and a permanent injunction prohibiting Man Wah from using Raffel's patents and/or trade dress. (Docket # 473.) I will address each issue in turn.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 50 provides that judgment may be entered against a party who has been fully heard on an issue during a jury trial if a "'reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (quoting Fed. R. Civ. P. 50(a) (motion for judgment as a matter of law), (b) (renewed motion for judgment as a matter of law)). In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence. *Id.* The court does not make credibility determinations or weigh the evidence. *Id.* Although the court reviews the entire record, the court "'must disregard all evidence favorable to the moving party that the jury [was] not

required to believe.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

Federal Rule of Civil Procedure 59 provides for a motion for a new trial and a motion to alter or amend a judgment. After a jury trial, the court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). A jury verdict is against the manifest weight of the evidence if no rational jury could have rendered a verdict against the moving party. *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006).

Further, a motion to alter or amend the judgment under Rule 59(e) is proper "only where the movant clearly establishes: (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Barrington Music Prod., Inc. v. Music & Arts Ctr.*, 924 F.3d 966, 968 (7th Cir. 2019) (internal quotation marks and citation omitted). A manifest error is the "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotation marks and citation omitted). Rule 59(e) does not allow a party to "undo its own procedural failures," to "introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment," *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996), or to rehash previously rejected arguments, *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014).

**ANALYSIS**

**Man Wah's Post-Trial Motions (Docket # 466)**

Man Wah moves for judgment as a matter of law under Rule 50(b) and/or moves for a new trial under Rule 59(a) as to Raffel's trade dress infringement, common law misappropriation, false marking, and patent infringement claims. (Docket # 466.) Man Wah further challenges the jury's damages awards as to each claim. I will address each issue in turn.

    *1.    Trade Dress Infringement*

Man Wah renews its motion for judgment as a matter of law under Rule 50(b) and moves for a new trial under Rule 59 as to Raffel's trade dress infringement claim on the grounds that Raffel failed to meet its burden to prove acquired distinctiveness, a likelihood of confusion, and non-functionality. (Docket # 467 at 10–19.)

    1.1    Applicable Law

"The 'trade dress' of a product is essentially its total image and overall appearance." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992) (internal citation and quotation omitted). "It . . . may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* In trade dress actions, a plaintiff must "articulate the specific elements which comprise its distinctive dress. . . . This enhanced burden is meant to avoid exceedingly general claims that seek coverage for something that is unprotectable." *Forest River, Inc. v. Winnebago Indus., Inc.*, No. 15-CV-609 RLM-MGG, 2017 WL 590245, at *2 (N.D. Ind. Feb. 14, 2017) (internal quotations and citations omitted). Then, to prevail on a claim of trade dress infringement, a plaintiff must show that (1) its trade dress is either inherently distinctive or has acquired secondary meaning,

5

and (2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). Even if the plaintiff successfully establishes these elements, the defendant can still prevail if the defendant demonstrates that the plaintiff's trade dress is functional. *Id.*

### 1.2 Analysis

#### 1.2.1 Acquired Distinctiveness

Man Wah argues that Raffel failed to prove at trial that its trade dress has acquired secondary meaning. Secondary meaning, also called acquired distinctiveness, is a mental association in consumers' minds between the appearance of the product and the product's source. *S.A.M. Elecs., Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1083 (N.D. Ill. 1999); *see also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992) (stating that secondary meaning is "a mental association in buyers' minds between the alleged mark and a single source of the product"); *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010) (defining "secondary meaning" as "a link in the minds of consumers between the marked item and its source"). "Secondary meaning is described as a showing that the primary significance in the minds of the consuming public is not the product but the producer." *Pride Communications Ltd. Partnership v. WCKG, Inc.*, 851 F. Supp. 895, 901 (N.D. Ill. 1994). Secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and proof of intentional copying. *Spraying Sys. Co.*, 975 F.2d at 393. "The most direct form of evidence of secondary meaning is consumer testimony or surveys." *S.A.M. Elecs.*, 39 F. Supp. 2d at 1083. Furthermore, "in order to prevail on a claim of infringement, secondary

meaning must have been acquired by *the date of first infringing use*." *Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1120 n.6 (Fed. Cir. 2018).

The parties agree that the relevant date of first infringing use is December 2017, the date Man Wah first purchased the accused cup holders from Long Rui. (Docket # 467 at 3; Docket # 487 at 4; Docket # 495 at 2.) Man Wah does not assert that the jury was improperly instructed as to acquired distinctiveness. (Docket # 442 at 31.) And the jury specifically found that Raffel had proven, by a preponderance of the evidence, that its alleged trade dress associated with its black cup holder had acquired distinctiveness to consumers. (Docket # 439 at 1.) Man Wah contends, however, that there was an insufficient evidentiary basis for a reasonable jury to find for Raffel on this issue. Raffel, on the other hand, argues that there is a "legion of evidence" that the ICH acquired distinctiveness "well before" December 2017. (Docket # 487 at 4.)

But Raffel need not present a "legion of evidence" supporting the jury's verdict; rather, it is *Man Wah's* burden to show that "*no rational jury*" could have found for Raffel. *See Bogan v. City of Chicago*, 644 F.3d 563, 572 (7th Cir. 2011) (emphasis added). At trial, Raffel introduced evidence that it was the first company in the industry to introduce lighted cup holders to the market (June 7, 2022 Jury Trial Tr. ("June 7 Tr.") at 330 Docket # 476) and that Raffel first introduced the specific trade dress found on the ICH cup holders in 2013 (June 9, 2022 Jury Trial Tr. ("June 9 Tr.") at 676, Docket # 478)—several years prior to the parties' agreed date of first infringing use in December 2017. Raffel also presented evidence that its ICH line of cup holders was Raffel's "premier" or "seminal" product (June 7 Tr. 230, 332; June 8, 2022 Jury Trial Tr. ("June 8 Tr.") at 491, 493, Docket # 477) and that Raffel's sales increased once the ICH cup holder design was introduced (June 9 Tr. 677).

Raffel's customers are primarily original equipment manufacturers ("OEM") of furniture, but also retailers and the end user of the furniture products. (June 7 Tr. 229–30.) Raffel introduced evidence that it promoted and advertised the ICH product through direct calls with customers, product catalogues, its website, trade publications, furniture trade shows, and general word of mouth (June 7 Tr. 229; June 15, 2022 Jury Trial Tr. ("June 15 Tr.") at 1714, Docket # 482.) Raffel introduced into evidence its 2016 product catalogue, which contains photographs of the ICH line and touts its benefits and functions. (June 7 Tr. 219–20, Pl.'s Ex. 10.)

Raffel points to several instances of consumer confusion, which Man Wah argues are irrelevant to the analysis because they post-date December 2017. (Docket # 495 at 12.) I disagree. Just because secondary meaning must have been acquired by the date of first infringing use, it does not follow that any subsequent instances of copying become irrelevant. Raffel presented evidence of secondary meaning prior to the first infringing use. This evidence from the following year simply bolsters the finding. Specifically, Raffel's current president, Rich Weeden, testified that in December 2018, Raffel received an email correspondence from a furniture end user who had purchased a piece of furniture from one of Raffel's retail clients, Value City Furniture. (June 7 Tr. 236, Pl.'s Ex. 16.) The cup holder in the piece of furniture had failed, and the customer contacted Raffel for a replacement part, noting that he found a cup holder "very close" to his failed cup holder on Raffel's website. (*Id.*) Upon further inspection, Weeden learned that the cup holder was not a Raffel cup holder, but one of Man Wah's "knockoff" cup holders. (June 7 Tr. 237–40, Pl.'s Ex. 16.) Similarly, Raffel presented evidence that another furniture retailer who sold products with the ICH cup holder, Flat Rock Furniture, also received complaints about failing cup holders and returned the cup holders to

Raffel, believing the cup holders to be Raffel's. (June 9 Tr. 678–79.) Raffel later learned that these cup holders were not Raffel's. (June 9 Tr. 679.) Furthermore, Guy Ray, Man Wah's CEO at the time, testified that Man Wah's cup holder was "pretty similar" to Raffel's and that it was hard to tell them apart. (June 13, 2022 Jury Trial Tr. ("June 13 Tr.") at 1106, Docket # 480.)

Finally, Raffel's expert, Professor Ronald Kemnitzer, also testified that in his expert opinion, Raffel's trade dress has acquired distinctiveness. (June 9 Tr. 675.) Professor Kemnitzer testified that in coming to this opinion, he considered Raffel's aggressive marketing of the ICH product; its market position, having "literally created the market for lighted cup holders"; the fact Raffel is an exclusive supplier for a number of major furniture manufacturers; the evidence of confusion from Flat Rock and Value City customers; and the nearly "identical" features of Man Wah's product, "so similar to those of Raffel that it seems to me impossible that it could've been created by accident." (June 9 Tr. 676–79.)

I find this evidence sufficient for a rational jury to find for Raffel on acquired distinctiveness.

### 1.2.2   Likelihood of Confusion

Man Wah argues that Raffel also failed to establish a likelihood that any consumer would be confused as to the source of the cup holders on the basis of trade dress. (Docket # 467 at 15.) Man Wah argues that Raffel's own expert, Richard Conroy, testified that Raffel and Man Wah are not "direct competitors" (June 9 Tr. 782), thus, there can be no likelihood of confusion because the "relevant class of customers and potential customers" is not the same (Docket # 467 at 15–16, citing *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015)).

Again, the jury specifically found that Raffel proved, by a preponderance of the evidence, that Man Wah's use of the alleged trade dress associated with Raffel's black cup holder caused a likelihood of confusion in the marketplace. (Docket # 439 at 2.) In determining likelihood of confusion, "it is imperative for the trier of fact to look to the totality of the circumstances and evidence and in its own sound judgment assess the likelihood of confusion. . . . The plaintiff need not prove each and every factor in order to prevail." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir. 1989). Such factors to consider are: the type of trade dress at issue, the similarity of design, the similarity of products, the identity of retail outlets and purchasers, the identity of the advertising media utilized, the alleged infringer's intent, and actual confusion. *Id.* at 1185.

Although Man Wah points to Conroy's testimony that Raffel and Man Wah are not "direct competitors," the factors for likelihood of confusion do not require the parties be "direct competitors." While Man Wah sells completed furniture and Raffel sells component parts, the two companies clearly compete in the same space of furniture retail. The fact that Man Wah's cup holder was found in a piece of furniture sold by Value City Furniture, a retailer who also sells furniture with Raffel's cup holders, indicates that the two companies are competitors. For the reasons stated above, Man Wah cannot show that no rational jury could have found for Raffel on this issue. Again, the instances of actual confusion with the Value City Furniture and Flat Rock Furniture customers, the visual similarities between the designs, and Professor Kemnitzer's expert opinion, all support the jury's determination.

### 1.2.3   Non-Functionality

Even if a plaintiff shows that its trade dress has acquired secondary meaning and that the similarity of the defendant's trade dress causes a likelihood of confusion, the defendant

can still prevail if it demonstrates that the plaintiff's trade dress is functional. *Thomas & Betts Corp.*, 138 F.3d at 291. Man Wah argues that the jury was improperly instructed as to functionality, and applying the correct standard, the evidence does not support a finding that Raffel's trade dress is non-functional. (Docket # 467 at 9–11.)

### 1.2.3.1 Waiver

As an initial matter, Raffel argues that Man Wah waived any objection to the non-functionality jury instruction by failing to object to the instruction before it was presented to the jury. (Docket # 487 at 23.) I disagree. Man Wah did object to the instruction on the basis it now raises in its final pretrial report (Docket # 406-2 at 10–11), and the parties' objections were preserved for the record (June 15 Tr. 1846). The jury was instructed as follows as to the requirement of non-functionality:

> As I stated earlier, Raffel must prove that Raffel's black ICH cupholder design is not "functional."
>
> A trade dress is "functional" if it is essential to the operation of the product as a whole. To determine this, you are to consider the following:
>
> > • Are there other designs that could perform the function equally well? (If so, this is evidence that the design is not functional.)
> > • Is there a patent that discloses the practical advantages of the design? (If so, this is strong evidence that the design is functional.)
> > • Does the design provide a practical advantage? (If so, this is evidence that the design is functional.)
> > • Has Raffel advertised or promoted the practical advantages of the design? (If so, this is evidence that the design is functional.)
> > • Does the design result from a comparatively simple, cheap, or superior method of manufacturing the product? (If so, this is evidence that the design is functional.)
>
> To determine whether a product's trade dress is functional, you should consider everything that makes up the trade dress.

(Docket # 442 at 33.) Man Wah argues that this instruction was too narrow because being "essential to the operation" of the product is only one way in which trade dress can be

functional. (Docket # 467 at 17.) Man Wah argues that trade dress can also be functional if it "affects the cost or quality of the article" or "whether the exclusive use of the feature would place competitors at a significant non-reputation-related disadvantage." (*Id.* (citing *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 644 (7th Cir. 2020).) Thus, Man Wah argues that because the jury instruction failed to include all three categories of functionality, the jury was improperly instructed on the legal standard. (*Id.*)

I disagree. Functionality falls more precisely into two categories: utilitarian functionality and aesthetic functionality. *See Flexible Steel*, 955 F.3d at 644. A product feature is considered functional and is ineligible for trade dress protection "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). Courts refer to this utilitarian functionality as the "*Inwood* formulation." *See id.*; *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001). The Supreme Court has recognized, however, that with certain products, aesthetic features, most notably color, can also be functional. In *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159 (1995), the Court explained that "if a design's 'aesthetic value' lies in its ability to 'confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs,' then the design is 'functional.'" *Id.* at 170 (quoting Restatement (Third) of Unfair Competition § 17, Comment c, pp. 175–76 (1993)). The *Qualitex* Court provided the example of a medication where the pill's color serves not only to identify the product's source, but to identify the type of medication. *Id.* at 169. If, for example, all blood pressure pills are colored blue, then prohibiting competitors from using blue for their blood pressure pills would put the competitors at a significant non-reputational disadvantage. *See id.* at 170.

Case 2:18-cv-01765-NJ   Filed 05/11/23   Page 12 of 56   Document 500

If, however, the product feature or design is functional under the *Inwood* formulation, then the court need not proceed further to consider whether there is a non-reputation-related disadvantage. *Flexible Steel*, 955 F.3d at 644. In other words, a jury need only consider reputational disadvantage in cases of aesthetic functionality. *Id.* And Man Wah acknowledges that Raffel chose to argue a utilitarian functionality argument, that trade dress is "functional" if it is essential to the operation of the product as a whole. (Docket # 467 at 17.) The jury instruction given mirrored this circuit's pattern instruction, which specifically provides in its notes that only in cases of "aesthetic functionality" should the jury also consider "whether the exclusive use of the feature would put competitors at a significant disadvantage not related to reputation." *See* Committee on Federal Criminal Jury Instructions of the Seventh Circuit, Pattern Criminal Jury Instructions of the Seventh Circuit, at 380–81 and n.5 (2008), http://www.ca7.uscourts.gov/pattern-jury-instructions/. Thus, I do not find the jury was improperly instructed as to non-functionality.

### 1.2.3.2    Merits

Man Wah argues that even if the jury was properly instructed, the evidence adduced does not support the jury's verdict that Raffel's trade dress is non-functional. (Docket # 467 at 18.) Again, the jury specifically found that Raffel proved, by a preponderance of the evidence, that its trade dress associated with the black cup holder is not merely functional. (Docket # 439 at 1.) Raffel presented evidence from its expert, Professor Kemnitzer, that in his expert opinion, the elements of Raffel's trade dress were non-functional. (June 9 Tr. 662–63.) Professor Kemnitzer explained how the colors used, the c-shaped flange, the dimples, the icons, and the appearance of the illumination are all non-functional aspects of the trade dress. (*Id.* at 667–70.) While Man Wah disagrees with Professor Kemnitzer's opinion, citing instead

the opinion of its own expert, Charles Vranian, who opined that those same trade dress components were indeed functional (Docket # 467 at 18–19), the jury was permitted to credit Kemnitzer's testimony over Vranian's. I see no reason to disturb the jury's finding on non-functionality.

### 1.3 Damages

Finally, Man Wah requests, pursuant to 15 U.S.C. § 1117(a), Rule 50(b), and/or Rule 59(a), that the Court either eliminate or reduce the jury's damages award on the trade dress infringement claim. (Docket # 467 at 20.) The jury awarded Raffel $1,181,617.00 in compensatory damages and $5,800,000.00 in Man Wah's profits. (Docket # 439 at 2.) The jury also found that Raffel proved, by a preponderance of the evidence, that Man Wah's trade dress infringement was willful. (*Id.*)

#### 1.3.1 Compensatory Damages

The Lanham Act provides that plaintiffs are entitled to recover: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The statute further provides that:

> The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

*Id.* Man Wah argues that under § 1117(a), the court has discretion to decline to award any compensatory damages to Raffel for Lanham Act infringement. (Docket # 467 at 20.) I do not read the statute as giving such discretion. Rather, the statute states that "[i]n assessing

damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." § 1117(a). In other words, the court's discretion is to allow damages *above* the amount found as actual damages, but not more than three times the amount.

Thus, I analyze the jury's damage award under Rule 50(b) and Rule 59(e), which considers whether the moving party can show that no rational jury could have reached its conclusion. Furthermore, the court should accord "substantial deference to a jury's determination of compensatory damages," looking at whether the plaintiff introduced evidence sufficient to support the award. *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir. 1985). While the damages amount "must be provable[,] . . . some uncertainty in making this calculation is allowed." *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994). The jury was instructed that in assessing "actual damages" for trade dress infringement, that they could consider:

> • Raffel's lost profits on lost sales, which consists of the revenue Raffel would have earned but for Man Wah's infringement, less the expenses Raffel would have sustained in earning those revenues;
>
> • Loss of goodwill. Goodwill is consumer recognition or drawing power of a trade dress. In determining loss of goodwill, you should compare the value of Raffel's goodwill before the infringement with the value of Raffel's goodwill after the infringement.

(Docket # 442 at 37.) Again, the jury awarded Raffel $1,181,617.00 in compensatory damages. (Docket # 439 at 2.) Man Wah argues that Raffel failed to present any evidence that it was damaged in the form of lost goodwill or lost profits due to Man Wah's alleged trade dress infringement and that the jury pulled its damages number "out of thin air." (Docket # 467 at 20–22.)

Man Wah acknowledges that the "closest evidence" Raffel presented regarding compensatory damages came from Paul Stangl, Raffel's executive chairman. (Docket # 467 at 21.) Stangl testified that Man Wah's defective "knockoff" cup holders were "devastating" to Raffel's business. (June 8 Tr. 574.) He testified that several of Raffel's customers, including Value City and American Signature, no longer use the ICH cup holders after experiencing the defects with the "knockoffs." (*Id.* at 551–52, 575.) Stangl testified that Raffel spent years building its business and developing its reputation for outstanding quality, spending "millions of dollars developing product," and that Man Wah's actions tore Raffel's reputation down "in a matter of months." (*Id.* at 574.) Man Wah argues that Stangl's testimony was conclusory and speculative. (Docket # 467 at 21.) But simply because Man Wah does not credit Stangl's testimony, does not mean that the jury was not permitted to do so.

Man Wah further argues that Raffel presented no concrete numbers to support the approximately $1.1 million award. (*Id.*) Clearly damage to reputation and loss of goodwill are difficult to measure with economic precision. *See Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). And it is not exactly clear how the jury came to their precise number of $1,181,617.00. But it does not follow that the jury, then, pulled the number "from thin air." Raffel presented evidence that it spent millions of dollars developing its products and that it took years to build its reputation for having a product of outstanding quality. Stangl testified that Man Wah destroyed this work in a matter of months. Thus, this number was not cut from whole cloth, but is sufficiently tied to the evidence to uphold the jury's award.

### 1.3.2    Man Wah's Profits

The Lanham Act also permits a plaintiff to recover the defendant's profits. Section 1117(a) does provide the Court with some discretion in awarding profits, stating that if "the

16

court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." The statute provides that in assessing profits, the plaintiff must prove the defendant's sales. *Id.* Again, the jury awarded Raffel $5.8 million in Man Wah's profits as damages for Man Wah's infringement. (Docket # 439 at 2.)

Man Wah argues that in situations where some or all of the infringer's profits are shown to be attributable to factors other than the infringement, the court should apportion the infringer's profits. (Docket # 467 at 23.) Man Wah argues that it does not sell cup holders, it sells completed furniture. (*Id.*) Thus, profits from the sale of the furniture must be apportioned to the value of the cup holders. (*Id.*) Both parties' experts offered opinions about profits apportioned to only the accused cup holders. Man Wah's expert testified that $194,344 represents the "incremental profit that Man Wah earned on the accused number of cup holders imported into the U.S." (June 15 Tr. 1616.) Raffel's expert, Conroy, testified that the "additional profits that Man Wah made due to their infringement" of the cup holders was $476,000. (June 9 Tr. 767.) Conroy further testified, however, that he was providing the jury with an additional perspective on damages that focuses on the financials associated with the sofas. This number amounted to between $5.8 and $11.6 million. (*Id.* at 767–74.)

The jury was instructed that "apportionment is appropriate if Man Wah shows that some or all of its profits are attributable to factors other than infringement." (Docket # 442 at 38.) While Man Wah argues that the jury "improperly ignored the apportionment evidence" (Docket # 495 at 17), the jury was not required to accept Varner's apportionment opinion. Conroy testified as to why he believed a calculation of Man Wah's profits for the furniture containing the cup holders is an appropriate measure of damages. (June 9 Tr. 767–68.)

Conroy opined that because Man Wah does not sell cup holders, and by estimating profits solely from the cup holders, Varner is "estimating a sale price for something they don't sell, and then estimating a profit margin on something they don't sell." (*Id.* at 810.) Contrary to Man Wah's assertion that the jury ignored the apportionment evidence, it appears that the jury considered the evidence presented and credited Conroy's estimation of damages over Varner's. I see no reason to disturb the jury's determination.

### 1.3.3 Admission of Conroy's Expert Opinion

Man Wah alternatively argues that the jury's verdict of $5.8 million in profits should be reduced to the apportioned amount because the jury was improperly prejudiced by the admission of Conroy's expert opinion that $5.8 million was an appropriate measure of damages. (Docket # 467 at 27.) During trial, Man Wah raised this issue, arguing that Conroy should not be allowed to offer this opinion because he did not present the opinion in his expert report. The issue was considered and rejected, and Conroy was allowed to testify as to this opinion. (June 9 Tr. 708–39.) Beyond rehashing its previously rejected arguments, Man Wah fails to provide a basis for reconsideration of this previous ruling.

### 1.3.4 The Jury's Finding of Willfulness

The jury found that Raffel proved by a preponderance of the evidence that Man Wah's trade dress infringement was willful. (Docket # 439 at 2.) The jury was instructed that "Man Wah acted willfully if it knew that it was infringing Raffel's trade dress or if it acted with indifference to Raffel's rights." (Docket # 442 at 39.) Man Wah argues that Raffel presented no evidence that Man Wah knew that it was infringing Raffel's trade dress. (Docket # 467 at 26.) Raffel counters that knowledge is not a prerequisite to willful infringement; rather, willful infringement can be established by showing the defendant either knew it was infringing or

acted with indifference to the plaintiff's trade dress rights. (Docket # 487 at 34.) Raffel argues it presented sufficient evidence to support the jury's verdict on willfulness.

I agree that Raffel presented sufficient evidence for a jury to reasonably infer that Man Wah willfully infringed its trade dress. Raffel's strongest evidence on this issue came from Man Wah's former CEO, Guy Ray. Raffel presented multiple emails between Ray and various other Man Wah employees discussing copying of Raffel's cup holders. For example, in September 2017, Ray sent an email to Bill Chan stating: "Someone needs to send me the cost of the new switches asap! I have not been advised of any recent cost changes. I do not know if RMT can duplicate the raffel switch without the possibility of a lawsuit. Does purchasing know if there is a patent on the design?" (June 13 Tr. 1080, Pl.'s Ex. 195.) Ray testified that RMT is one of Man Wah's subsidiaries that makes components. (*Id.*) Chan responded to Ray: "For the cupholder switch (enclosed is the photo), Raffel has the patent, so that's why I did not mention it in previous email." (*Id.*) Ray acknowledged that the photo attached was the black ICH cup holder. (*Id.* at 1081–82.)

Raffel presented an email between Ray and Tommy Wong, Assistant Director of the Man Wah group in China, from November 2018 stating:

> [It] appears our supplier even used raffel patent # stickers on the product in an effort to [deceive] the consumer, retailer, etc (I am sure this had to do with the fact that about 3 years ago everyone was sued over this cupholder and we were forced to buy it from raffel, as was the industry) I guess that is why we thought we would be smart and attach the stickers thinking that would solve the problem . . . . What I need from you, is a sense of how many cupholder units we have bought from the knockoff supplier and how many we have bought from raffel since September 2017. Need to know by month.

(*Id.* at 1102, Pl.'s Ex. 69.)

In another email from November 2018, Ray writes to Wong:

> [I] received the information and made a quick review. I need someone to attach a photo of each cupholder by the description so I can better understand the scope of the cupholder/cupholders in question. the dumbest thing we did, was have the new supplier use raffel patent # and description on each piece not only is that patent infringement, but it is fraud which if raffel wanted to pursue, could be escalated to criminal charges in addition to the civil charges already filed.

(Pl.'s Ex. 203.) At trial, Ray testified that he was speaking passionately in the email, that he was not saying that Man Wah directed the supplier to use stickers with Raffel's patent numbers, and that he did not know at whose direction it came. (June 13 Tr. 1119.) But the jury had the opportunity to observe Ray testify. The jury was instructed that in evaluating the truthfulness and accuracy of a witness' testimony, they were permitted to consider, among other things, the manner of the witness while testifying. (Docket # 442 at 12.) Thus, the jury was permitted to disbelieve Ray's subsequent trial testimony in favor of the plain language of Ray's previous email.

Raffel further produced an email between Wong and Fabio D'Accio, Man Wah's head of quality assurance in the United States (June 13 Tr. 1087) from December 2018 in which Wong is informing D'Accio of quality issues with cup holders provided to its customer, American Signature, and that American Signature is "asking for replacement with only Raffel cupholders because of recent increase failure" (Pl.'s Ex. 70). D'Accio responded to Wong, copying Ray, stating that the cupholders had been failing consistently from early summer to the end of 2018 and that he "thought that specific cupholder was supplied only by a Chinese manufacturer but few days ago I accidentally discovered the design belongs to Raffel and at some point we started using 'Longrui' (Chinese supplier) on top of Raffel or use less Raffel and more Longrui cupholders." (*Id.*)

Furthermore, Ray testified that Man Wah's "knockoff" cup holders were "pretty similar" to Raffel's and agreed that it is hard to tell them apart. (*Id.* at 1106.) When asked

whether it was "pretty fair to infer that the directions to Long Rui were, copy this product down to the T," Ray did not deny it, but stated that he "can't speak to that. I wasn't there." (*Id.*) Given that Ray was Man Wah's CEO, coupled with the emails that were presented, it was rational for the jury to infer that Ray knew about the copying and that even if he did not specifically direct it, he did not work to stop it. For these reasons, the evidence reasonably supports the jury's verdict on willfulness.

### 2. Common Law Misappropriation

Man Wah renews its motion for judgment as a matter of law under Rule 50(b) and moves for a new trial under Rule 59 as to Raffel's common law misappropriation claim on the grounds that Raffel failed to prove each of the three elements of misappropriation. (Docket # 467 at 20–26.) Man Wah also argues that Raffel's common law misappropriation claim is preempted by the Lanham Act. (*Id.* at 31–34.) Finally, Man Wah argues Raffel has not proven compensatory or punitive damages, or alternatively, the jury's award of punitive damages must be reduced under Wisconsin law. (*Id.* at 26–30.)

### 2.1 The Jury's Verdict on Common Law Misappropriation

The jury determined that Raffel proved, by a preponderance of the evidence, that Man Wah misappropriated Raffel's trade dress and awarded damages in the amount of $1 million. (Docket # 439 at 3.) The jury was instructed that to prove misappropriation, Raffel needed to prove: (1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to Raffel. (Docket # 442 at 41.) Man Wah argues that Raffel presented no evidence as to any of the three elements of common law misappropriation. (Docket # 467 at 29–31.)

As to the first element, Man Wah argues Raffel failed to show the *actual* time, labor, and money expended to create the trade dress of the ICH cup holders and that Stangl's testimony regarding Raffel's research and development of products was too general. (*Id.* at 21.) But Man Wah presents no authority that to prove common law misappropriation, one needs to have kept specific records showing the *actual* time, labor, and money expended. Stangl testified that Raffel constantly innovates, coming up with new products for the furniture industry. (June 8 Tr. 487.) Stangl testified that Raffel has spent "millions and millions of dollars" on research and development of products as the "heartbeat of our company is the engineering and the innovation." (*Id.* at 489.) Ken Seidl, Raffel's VP of Sales, testified regarding his creation of the trade dress of the ICH cup holders and what it entailed. (June 7 Tr. at 319–31.) Thus, there was sufficient evidence for the jury to conclude that Raffel spent considerable time, labor, and money creating its trade dress.

As to the second and third elements, Man Wah argues that the evidence showed that Man Wah and Raffel were not competitors, again citing Conroy's testimony that the two companies were not "direct competitors" and that Raffel failed to prove it suffered any commercial damage. (Docket # 467 at 30.) While not direct competitors, Raffel and Man Wah do compete in the same market space—Man Wah sells completed furniture and Raffel sells component parts for furniture. Once again, the fact that Man Wah's cup holder was found in a piece of furniture sold by Value City Furniture, a retailer who also sells furniture with Raffel's cup holders, indicates that the two companies are competitors. Further, as stated above, Stangl testified that Raffel spent years building its business and developing its reputation for outstanding quality, spending "millions of dollars developing product," and

that Man Wah's actions tore Raffel's reputation down "in a matter of months." (June 8 Tr. 574.) Sufficient evidence supports the jury's finding as to these elements.

### 2.2     Preemption

Man Wah further argues that Wisconsin common law for misappropriation does not extend to provide a cause of action for circumstances that are the same as Lanham Act trade dress infringement. (Docket # 467 at 31.) Man Wah argues that even if it did, the common law claim would be preempted by the Lanham Act. (*Id.*) Man Wah acknowledges that the Court previously considered and dismissed Man Wah's preemption argument at the pleading stage, but now that it "has become clear" that there is not merely a "potential conflict," it renews its preemption arguments. (*Id.* at 31 n.6.)

I disagree. Man Wah pled preemption as an affirmative defense, which Raffel moved to strike. (Docket # 189 at 10.) I granted Raffel's motion, but gave Man Wah leave to re-plead, finding that Man Wah's preemption affirmative defense lacked sufficient detail to determine legal sufficiency. (*Id.* at 11.) Man Wah did re-plead the preemption affirmative defense, which Raffel again moved to strike. (Docket # 235 at 5.) Man Wah argued that it was putting the Court on notice of a potential conflict between Raffel's common law misappropriation claim and its Lanham Act claim. (*Id.* at 6.) I considered Man Wah's arguments at that time on the merits of preemption and determined that Man Wah's argument that Raffel was effectively "double-dipping" its trade dress damages does not invoke preemption. (*Id.* at 6–7.) Nothing was left open at that time—Man Wah's preemption argument was addressed and rejected on the merits. I see no reason to revisit it now.

### 2.3 Compensatory Damages

The jury awarded Raffel $1 million in damages on its misappropriation claim. (Docket # 439 at 3.) Man Wah argues that the jury's award "bears no relation to any evidence presented during trial." (Docket # 467 at 34.) I disagree. As stated above, Stangl testified that Raffel has spent "millions and millions of dollars" on research and development of products as the "heartbeat of our company is the engineering and the innovation." (June 8 Tr. 489.) Given Stangl's testimony regarding the relative success of the ICH cup holder amongst Raffel's products and Seidl's testimony regarding the process it took Raffel to develop the ICH cup holder's trade dress, it was reasonable for the jury to estimate $1 million out of the multiple millions Stangl testified Raffel spends on research and development.

### 2.4 Punitive Damages

The jury also found that Man Wah acted either maliciously or in an intentional disregard for Raffel's rights in misappropriating the trade dress and awarded punitive damages in the amount of $97.5 million. (Docket # 439 at 3.) As an initial matter, Man Wah argues that the question of punitive damages should not have been submitted to the jury in the first place because Raffel failed to establish a *prima facie* case for the allowance of punitive damages. (Docket # 467 at 38.) I reject Man Wah's argument on this issue as undeveloped and unpersuasive.

Man Wah further argues that the punitive damages award violates Wisconsin's well-established statutory cap on punitive damages and thus must be reduced. (*Id.* at 35.) Raffel does not dispute the general applicability of Wisconsin's statutory cap on punitive damages; rather, it argues that the cap applies to all the compensatory damages it was awarded for all causes of action, not just for the misappropriation claim. (Docket # 487 at 42.)

Wis. Stat. § 895.043(6) provides that "[p]unitive damages received by the plaintiff may not exceed twice the amount of any compensatory damages recovered by the plaintiff or $200,000, whichever is greater." Raffel argues that the statute's use of the term "*any*" indicates that when compensatory damages are awarded for claims that both do and do not support the punitive damages award, the statutory cap is calculated upon the total compensatory damages. (Docket # 487 at 42.) Raffel provides no authority in support of this position. Under Raffel's argument, it could obtain punitive damages under the federal claims for trade dress infringement, patent infringement, and false patent marking, federal claims that do not otherwise provide for punitive damages.

Thus, under Wis. Stat. § 895.043(6), punitive damages on Raffel's claim of common law misappropriation are limited to $2 million, or twice the compensatory damages Raffel recovered on its misappropriation claim. Thus, Raffel's punitive damages award is reduced from $97.5 million to $2 million.

Man Wah further argues, however, that even an award of $2 million is excessive. (Docket # 467 at 36–38.) The award of punitive damages is within the discretion of the jury; though the court has the power to reduce the amount of punitive damages to an amount that it determines is fair and reasonable. *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 626, 563 N.W.2d 154, 163 (1997). Wisconsin courts are "reluctant to set aside an award merely because it is large or we would have awarded less," and a "jury's punitive damage award will not be disturbed unless the verdict is so clearly excessive as to indicate passion and prejudice." *Id.*

The United States Supreme Court has applied a three-part test to determine whether an award of punitive damages is excessive. *Kimble v. Land Concepts, Inc.*, 2014 WI 21, ¶ 46,

353 Wis. 2d 377, 399–400, 845 N.W.2d 395, 407 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)). The reviewing court must weigh: (1) the degree of egregiousness or reprehensibility of the conduct; (2) the disparity between the harm or the potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct. *Id.* Wisconsin utilizes a "substantively identical test applying six factors rather than three": (1) The grievousness of the acts; (2) The degree of malicious intent; (3) Whether the award bears a reasonable relationship to the award of compensatory damages; (4) The potential damage that might have been caused by the acts; (5) The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and (6) The wealth of the wrongdoer. *Id.* ¶ 47.

I do not find a punitive damage award of $2 million so excessive as to violate due process. Raffel's most damning evidence came from Man Wah's own CEO, Guy Ray, in the form of emails between him and other Man Wah employees seemingly showing knowledge of the copying and calling their own actions "fraud." On the stand, Ray attempted to walk back his email statements by repeatedly testifying that he "misspoke" (June 13 Tr. 1104), or wrote a "typo" (*id.* at 1107), or was just speaking "passionately" (*id.* at 1119). Ray otherwise denied knowledge of what was happening at Man Wah, despite being the person in charge. (*Id.* at 1119.) When asked what he meant by saying the copying was "fraud," Ray testified that he "made a mistake. I wrote this wrong. I phrased it wrong. I made a lot of mistakes in my life." (*Id.* at 1120.) Ray's emails and testimony clearly support the jury's finding that Man Wah acted in intentional disregard to Raffel's rights. And a ratio of 2:1 between compensatory and punitive damages, especially for a company with annual sales amounting to $2.5 billion

(June 10 Jury Trial Tr. ("June 10 Tr.") at 844, Docket # 479), is far from excessive or shocking. For these reasons, I find a punitive damages award of $2 million to be reasonable.

### 3. *False Marking*

Man Wah renews its motion for judgment as a matter of law under Rule 50(b) and moves for a new trial under Rule 59 as to Raffel's false marking claim on the grounds that Raffel failed to prove the elements of false marking under the statute. (Docket # 467 at 38–42.) The basis of Raffel's false marking claim was the allegation that Man Wah marked its cup holders with Raffel's patent numbers. The jury found in Raffel's favor as to each element of the false marking claim and awarded Raffel $360,400 in damages. (Docket # 439 at 5–6.)

The Patent Act prohibits:

> Mark[ing] upon, or affix[ing] to, or us[ing] in advertising in connection with. . . [any article, the] "name or any imitation of the name of the patentee, the patent number, or the words 'patent,' 'patentee,' or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee.

35 U.S.C. § 292(a). In order to sue under the false marking statute, a plaintiff must have "suffered a competitive injury as a result of a violation" of the marking statute. *Id.* § 292(b). A "competitive injury" is defined as "[a] wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair competition; a disadvantage in a plaintiff's ability to compete with a defendant, caused by the defendant's unfair competition." *Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1400 (Fed. Cir. 2015) (quoting Competitive Injury, Black's Law Dictionary (9th ed. 2009)). "In the false-marking context, the injury must be one inflicted on a firm's competitive activity, caused by the false marking." *Id.* at 1402, 1400 n.3; *see also Gravelle v. Kaba Ilco Corp.*, 684 F. App'x 974, 978 (Fed. Cir. 2017). Man Wah argues that Raffel

failed to prove that Man Wah intended to imitate Raffel's marks or deceive the public and failed to show a competitive injury. (Docket # 467 at 38.)

The evidence is clear that the "knockoff" cup holders had stickers on them containing Raffel's patent numbers. As to intent to deceive, however, Man Wah points to multiple pieces of evidence it states counter a finding of intent. For example, Man Wah argues that once the cup holders were installed in the furniture, the stickers were not visible, thus cutting against a finding of intent. (*Id.* at 39.) Man Wah argues that it was Long Rui who put the stickers on the cup holders, not Man Wah, and once Man Wah learned of the markings, it instructed Long Rui to remove the stickers. (*Id.* at 40.) Man Wah argues that the "only evidence even arguably to the contrary" was Guy Ray's "unfounded speculation." (*Id.*)

Man Wah understates the importance of Ray's testimony. The jury was not required to believe Man Wah's version of events that Long Rui placed the stickers on the cup holders without Man Wah's knowledge or consent. Rather, Ray, who was Man Wah's CEO, wrote in an email to Tommy Wong:

> [It] appears our supplier even used raffel patent # stickers on the product in an effort to [deceive] the consumer, retailer, etc (I am sure this had to do with the fact that about 3 years ago everyone was sued over this cupholder and we were forced to buy it from raffel, as was the industry) I guess that is why we thought we would be smart and attach the stickers thinking that would solve the problem . . . .

(Pl.'s Ex. 69.) In another email, Ray writes to Wong that "the dumbest thing we did, was have the new supplier use raffel patent # and description on each piece not only is that patent infringement, but it is fraud which if raffel wanted to pursue, could be escalated to criminal charges in addition to the civil charges already filed." (Pl.'s Ex. 203.) As stated above, while Ray testified that he was simply speaking passionately in the email, that he was not saying that Man Wah directed the supplier to use stickers with Raffel's patent numbers, and that he

28

did not know at whose direction it came (June 13 Tr. 1119), once again, the jury was permitted to disbelieve Ray's subsequent trial testimony in favor of the plain language of the email. This evidence sufficiently supports the jury's finding of Man Wah's intent to deceive.

Man Wah further argues that the evidence does not prove that any competitive injury Raffel sustained was a result of the false marking. (Docket # 467 at 41.) But the jury's damages award for false marking clearly shows they were persuaded by the expert testimony of Conroy, who opined damages in the amount of $360,400 (June 9 Tr. 748) and explained how he came to determine these damages based on Man Wah's alleged false marking (*id.* at 775–79). Again, while Man Wah disagrees with this evidence, the jury was permitted to credit it over the countervailing evidence. Once again, I see no reason to disturb the jury's verdict.

*4.    Patent Infringement*

Man Wah moves for a new trial under Rule 59 as to the jury's findings of non-obviousness and willful infringement of claim 1 of the '293 patent, arguing that the jury was erroneously instructed and that the special verdict form was in error. I will address each in turn.

4.1    Instruction on Obviousness

Pursuant to 35 U.S.C. § 103, a patent for a claimed invention may not be obtained "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." "Obviousness" is "a question of law based on underlying findings of fact," such as "(1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) the presence of evidence of secondary

considerations, such as commercial success, long felt but unsolved needs, failure of others, and unexpected results." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1372 (Fed. Cir. 2019) (internal quotations and citation omitted).

In this case, the instructions given to the jury as to obviousness followed the Seventh Circuit's pattern instructions 11.1.14, 11.3.6, and 11.3.6.1. (Docket # 442 at 52–53.) The pattern instruction states as follows:

> In making your decision regarding obviousness, you should consider the following:
>
> > 1) The scope and content of the prior art. You may consider prior art that was reasonably relevant to the problem the inventor faced, including prior art in the field of the invention and prior art from other fields that a person of ordinary skill would consider when attempting to solve the problem.
> >
> > 2) Any differences between the prior art and the invention in the patent claim.
> >
> > 3) The level of ordinary skill in the field of the invention at the time of the invention.
> >
> > [4] Any of the indications of non-obviousness described in the next instruction that are shown by the evidence.]

7th Cir. Pattern JI-Civil 11.3.6. Man Wah does not take issue with how the jury was instructed as to the first three factors to consider. Rather, Man Wah challenges the jury's instruction as to the fourth factor, which the committee comments to the pattern instructions note "is bracketed because there may be cases in which no evidence regarding such considerations is offered." (Committee Comment No. 6.) In cases where such secondary considerations do exist, the pattern instructions offer an additional instruction as to other factors to consider in the obviousness analysis. 7th Cir. Pattern JI-Civil 11.3.6.1. Again, the jury in this case was instructed in a substantially similar manner as the pattern instruction. Man Wah contends,

however, that in order to accord substantial weight to secondary considerations in an obviousness analysis, the law requires that the "evidence of secondary considerations must have a 'nexus' to the claims, i.e., there must be 'a legally and factually sufficient connection' between the evidence and the patented invention," *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)), and the jury instruction did not properly instruct the jury as to the "nexus" requirement (Docket # 467 at 42). Man Wah argues that because Raffel relied heavily on these secondary considerations and the evidence failed to establish this necessary nexus, it is impossible to determine how much weight the jury "improperly afforded Mr. Kemnitzer's testimony of purported objective indicia." (*Id.* at 43.) Man Wah further argues that the special verdict form similarly errs by failing to ask a question regarding a nexus. (*Id.* at 42.)

While the jury instruction does not use the word "nexus," the instruction clearly explains that there must be a connection between the evidence and the patented invention. For example, the first factor asks whether the invention achieved commercial success, continuing, "If so, is that success based on the invention itself, rather than on advertising, promotion, sales tactics, or features of the product other than those found in the claimed invention?" (Docket # 442 at 53.) This clearly contemplates a "nexus" between the commercial success and the invention. And Raffel presented evidence from its expert, Kemnitzer, explaining that the secondary considerations he opined demonstrated non-obviousness, such as commercial success, licensing, and evidence of copying. (June 15 Tr. at 1748–65.) While Man Wah may disagree with Kemnitzer's testimony, Man Wah elicited

contrary testimony from its expert and cross-examined Kemnitzer on his opinions. I find no error in how the jury was instructed necessitating reversal of the jury's verdict.

### 4.2 Instruction on Willfulness

Man Wah further argues that a new trial is warranted under Rule 59 because the jury was incorrectly instructed on willfulness and the special verdict form similarly was in error. First, Man Wah argues that knowledge of the asserted patent is a necessary element for a finding of willfulness, and the jury instruction failed to instruct the jury that Man Wah needed to have knowledge of the '293 patent at the time of the accused acts. (Docket # 467 at 44.) As to willful infringement, the jury was instructed as follows:

> Infringement is willful if Raffel proves by a preponderance of the evidence that Man Wah knew that it was infringing the patent or acted in reckless disregard of Raffel's rights. In making this determination, you should consider all of the evidence, including any evidence regarding whether Man Wah acted maliciously, deliberately, or in bad faith.

> You should consider what Man Wah knew at the time that it performed the acts that are accused of infringement or manufactured or sold the accused product.

(Docket # 467 at 44.) Man Wah argues that these two sections, taken together, somehow suggest that Man Wah's knowledge of the '293 patent at the time of the accused conduct was an optional consideration for willfulness, rather than a prerequisite. (*Id.*) Man Wah's argument is belied by the plain language of the instruction. Implicit in the instruction that Raffel must prove that Man Wah knew it was infringing the patent or acting in reckless disregard of Raffel's rights is Man Wah's knowledge of the existence of the '293 patent. One cannot knowingly infringe something if one does not know what the thing is. Nor does the instruction regarding consideration of what Man Wah knew at the time it performed the accused acts indicate that knowledge is optional. Rather, this statement encapsulates that in

determining willfulness, "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016). I find no error in the jury's instruction on willfulness to warrant a new trial.

Man Wah also argues that the verdict form was flawed. Specifically, the verdict form for patent infringement first asked whether Man Wah proved that claim 1 of the '293 patent was invalid as obvious. (Docket # 439 at 4.) The jury answered "no," so the verdict form instructed them to proceed to question two, which asked whether Raffel proved that Man Wah's infringement was willful. (*Id.*) The jury answered "yes," so the verdict form instructed them to proceed to question three, which asks what amount of money, using the stipulated reasonable royalty rate, would adequately compensate Raffel for Man Wah's infringement. (*Id.*) The jury awarded $425,300 in damages. (*Id.*) Had the jury answered question two "no", however, the verdict form would have directed them to proceed to the next set of questions on the false marking claim, and skip the damages question altogether. (*Id.*)

Man Wah argues that because questions two and three could be answered only if the previous question was answered affirmatively, this ordering required the jury to find willfulness in order to award *any* damages for patent infringement. (Docket # 467 at 44–45.) Thus, Man Wah argues that the verdict form invited the jury to find willfulness if they wanted to award damages for the patent infringement that they were instructed that the court had already found as to claim 1 of the '293 patent. (*Id.*)

Man Wah argues that it had previously proposed a special verdict form where the question of infringement damages was asked first, and then a question was asked regarding willfulness, unconnected to the previous damages question. (Docket # 391-3.) While Raffel

acknowledges that Man Wah previously proposed a verdict form with the damages question first, it argues that Man Wah waived its objection by not specifically objecting to this verdict form. (Docket # 487 at 50.) Man Wah counters, however, that all of its objections were preserved on the record before closing argument. (June 16 Jury Trial Tr. ("June 16 Tr.") at 1893, Docket # 483.)

I do not find that Man Wah waived its objection. Considering the merits, however, I do not find Man Wah is entitled to a new trial on this issue. The jury was specifically instructed that the Court had already determined that Man Wah infringed claim 1 of the '293 patent and thus the jury was only deciding whether the infringement was willful. (Docket # 442 at 55.) The jury was specifically instructed that not all infringement is willful. (*Id.*) As to damages, the jury was instructed that if "you find claim 1 of the '293 patent is valid, you are to award Raffel damages adequate to compensate Raffel for the infringement I already found." (*Id.* at 56.) The jury was instructed that the "damages you award are intended to compensate the patent holder, *not to punish the infringer.*" (*Id.* (emphasis added).)

A verdict form must not be confusing or misleading to the jury, and in evaluating whether the form is confusing or misleading, "we consider the verdict form in light of the instructions given to determine 'whether [the jury] had [an] understanding of the issues and its duty to determine those issues.'" *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (internal citation omitted). In this case, I do not find that the order of the questions on the verdict form warrants a new trial. The jury was specifically instructed that it was only deciding damages on the patent infringement the Court already found and that the damages it awards, if any, are not intended to punish the infringer. Thus, I do not find the

verdict form misled the jury into believing that it had to find willfulness in order to award Raffel damages for the patent infringement the Court already found.

### 5. Duplicate Damages

Finally, Man Wah argues that Raffel's damages award should be reduced under Rule 59 to avoid double recovery. Man Wah argues that the damages the jury awarded Raffel all arise from the same set of operative facts, Man Wah's sale of furniture containing the "knockoff" cup holders, and thus the damage award must be reduced to avoid double recovery. (Docket # 467 at 45–46.) Man Wah further argues that Conroy used the incorrect number of cup holders in calculating lost profits and thus any award granted must be reduced by 18.8%. (*Id.* at 47 n.9.)

Even though damages are claimed based upon separate statutes or causes of action, when the claims arise out of the same set of operative facts, as is the case here, there may be only one recovery. *Aero Prod. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1020 (Fed. Cir. 2006). Again, Raffel was awarded damages as follows:

| Trade Dress Infringement | $1,181,617 (infringement damages including Raffel's lost profits and loss of goodwill) | $5.8 million (disgorgement of Man Wah's profits) |
| Misappropriation of Trade Dress | $1 million (Raffel's damages) | $2 million (reduced punitive damages award) |
| Patent Infringement | $425,300 (reasonable royalty rate) | |
| False Patent Marking | $360,400 | |

As to Raffel's two awards for trade dress infringement, i.e., actual damages and disgorged profits, the parties agree that these damages are not duplicative of each other because the Lanham Act permits recovery for both, *see* 15 U.S.C. § 1117(a). (Docket # 495 at 26 n.32.) And Raffel does not dispute that the actual damages awarded for trade dress infringement and misappropriation are duplicative. (Docket # 487 at 51.) Raffel

acknowledges that the jury was instructed that Raffel's actual damages for trade dress infringement and misappropriation could be based on Raffel's lost profits and/or loss of goodwill. (*Id.*) In fact, the jury awarded very similar amounts for both ($1.18 million and $1 million, respectively). Thus, I agree that these two awards are duplicative and will award Raffel the larger amount of $1,181,617.00.

The parties dispute, however, whether Raffel's award for patent infringement and false marking are duplicative of the trade dress infringement damages. Man Wah argues that Raffel's trade dress claims, patent infringement claim, and false marking claim all arise from the same set of operative facts—the same set of sales of the ICH cup holders. (Docket # 495 at 26.) Raffel argues that because the damages for false marking and patent infringement, unlike those for trade dress infringement and misappropriation, were based on lost profits and a reasonable royalty and were not based on a loss of goodwill, these damages represent separate and distinct injuries. (Docket # 487 at 51.)

I disagree. In assessing damages for trade dress infringement, the special verdict form specifically told the jury that they may consider Raffel's lost profits, as well as its loss of goodwill, in assessing damages. (Docket # 439 at 2.) While Raffel supposes that the jury, in awarding its trade dress damages, could very well have awarded the entire damage amount based on loss of goodwill and not lost profits, this assertion is contrary to Raffel's earlier argument in support of upholding the trade dress damages award when it argued that Stangl testified that Raffel lost profits *and* its goodwill was damaged by Man Wah's trade dress infringement. (Docket # 487 at 30–31.)

It is clear that the damages awarded by the jury for false patent marking, patent infringement, and trade dress infringement were all based on the same injury—Man Wah's

sale of furniture containing the infringing cup holders. This is confirmed by Raffel's damages expert, Conroy, who testified how he quantified Raffel's claims against Man Wah. (June 9 Tr. 746–48.) In assessing the damages for patent infringement, Conroy testified that in performing the reasonable royalty rate calculation that forms the basis for his opinion, the first input is the number of infringing units sold. (*Id.* at 749–50.) The number of infringing units sold is also vital to the calculation for trade dress damages (*id.* at 764–74) and false marking damages (*id.* at 776–79), although the false marking damages represent a smaller subset of the larger number sold.

The Federal Circuit's decision in *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) is instructive. In *Texas Advanced*, plaintiff and defendant were companies that each developed and sold ambient light sensors, which are used in electronic devices to adjust screen brightness in response to incident light. *Id.* at 1308. The parties confidentially shared technical and financial information during negotiations regarding a possible merger. The parties ultimately went their separate ways, but soon after, defendant released new sensors with the technical design plaintiff had disclosed in the confidential negotiations. *Id.* Plaintiff sued defendant for patent infringement, trade secret misappropriation, breach of contract, and tortious interference with prospective business relations under Texas state law. *Id.* at 1308. A jury returned a verdict for plaintiff and awarded damages on all four claims. The court ruled on the parties' post-trial motions and entered final judgment, and both parties appealed. *Id.*

On appeal, the defendant argued that the district court erred in concluding that the award for patent infringement was not duplicative of the award for trade secret misappropriation. The federal circuit agreed. The court found that defendant's use of

plaintiff's photodiode array structure was the basis of defendant's liability for both trade secret misappropriation and patent infringement. *Id.* at 1328. The court explained as follows:

> The award for patent infringement was based on a subset of the sales that form the basis of the award for trade secret misappropriation: patent infringement damages were based on sales of the ISL29001, ISL29002, ISL29003, and ISL29004; the trade secret misappropriation award was based on sales of those four products and more than a dozen others. The patent award represents an impermissible double recovery.
>
> The double recovery is clear from the [plaintiff's] expert's calculations. [Plaintiff's] expert calculated a disgorgement award for the trade secret misappropriation in which all profits made from sales of the infringing products (plus all profits made from sales of additional products) would go to [plaintiff]. The expert calculated a reasonable royalty for the patent infringement based on a fraction of the total profits for those infringing products. The jury chose to award the full amount ($48,783,007) of the expert's proposed disgorgement award for the trade secret misappropriation and a partial amount ($73,653.51) of the expert's proposed royalty for the patent infringement ($105,219).
>
> The royalty award for patent infringement was therefore duplicative of some portion of the disgorgement award for trade secret misappropriation, to the extent the awards cover the same period. The jury's disgorgement award for trade secret misappropriation covered the period from April 2006 through March 2014. [Plaintiff's] expert's proposed royalty calculation for patent infringement covered a subset of that period, namely, January 2007 through March 2014. Thus, although the jury awarded only a portion of the proposed patent royalty, the patent award on appeal covers sales (in fact, only sales) that are already part of the disgorgement award. Such overlap is improper.

*Id.* at 1328–29 (internal citations omitted). Similarly, the jury's award of damages for patent infringement and false marking are duplicative of the trade dress infringement damages. For this reason, Raffel is entitled to recover $1,181,617.00 in actual damages and $5.8 million in disgorgement of profits on its trade dress infringement claim and $2 million on its punitive damages award claim for misappropriation of trade dress.

Man Wah also argues that the trade dress infringement damages must be reduced by 18.8% because Conroy wrongly used as his base cup holder number the number of cup holders Man Wah ordered (58,932) versus the number of cup holders Man Wah actually received

(47,856). (Docket # 467 at 47 n.9.) Man Wah extensively addressed this issue with Conroy on cross-examination, and Conroy testified why he believed that the 58,932 number was the accurate number over the lower number. (June 9 Tr. 785–88.) The jury was entitled to believe Conroy's testimony. There is no basis for a reduction of damages by 18.8%.

**Raffel's Post-Trial Motions (Docket # 473)**

Raffel argues the Court should award treble damages for the jury's finding of patent and trade dress infringement; should enhance the award of Man Wah's profits for willful trade dress infringement; should award attorneys' fees, prejudgment interest, and certain non-taxable costs; and should issue a permanent injunction prohibiting Man Wah from using Raffel's patent and trade dress. (Docket # 473.) I will address each issue in turn.

    1.    *Enhanced Damages for Patent and Trade Dress Infringement*

        1.1    Treble Damages for Willful Patent Infringement

The jury determined that Man Wah willfully infringed claim 1 of the '293 Patent. (Docket # 439 at 2.) The Patent Act provides that "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Section 284 gives district courts "discretion in deciding whether to award enhanced damages, and in what amount." *Halo Elecs.*, 579 U.S. at 104. The Supreme Court in *Halo* counsels that enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior. The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 103–04.

The Federal Circuit has set forth the following factors to guide the enhancement analysis: (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, (3) the infringer's behavior as a party to the litigation, (4) the defendant's size and financial condition, (5) the closeness of the case, (6) the duration of defendant's misconduct, (7) remedial action by the defendant, (8) the defendant's motivation for harm, and (9) whether the defendant attempted to conceal its misconduct. *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1177 (Fed. Cir. 2022).

For much the same reasons I found evidence sufficient to uphold the jury's finding of willful patent infringement, I find enhanced damages are warranted in this case. Man Wah and Raffel had a business relationship since 2015 where Man Wah was purchasing cup holders from Raffel. (June 7 Tr. 332–33.) Ken Seidl of Raffel described the two companies as having a "great working relationship" and stated that Man Wah was a "great customer" of Raffel products. (*Id.*) But things quickly began to sour.

In April 2015, an individual from Man Wah's factory in China had requested that Raffel send him samples of Raffel's ICH cup holders. (June 8 Tr. 517, Pl. Ex. 43.) Raffel did so, believing Man Wah was using the sample cup holders for the Las Vegas furniture market coming up in August. (*Id.*) When Stangl and Bill Johnson, a Raffel salesman, attended the August 2015 market, they saw Man Wah displaying non-Raffel cup holders in their showroom. (*Id.*) Stangl subsequently instructed Johnson to reach out to Guy Ray and told him in an email: "I am sure you are not aware that Raffel holds patents on this product and the cup holders used by Man Wah may be in violation of one or more of these patents." (*Id.*

at 518, Pl.'s Ex. 43.) Stangl testified that the cup holders being used in Man Wah's furniture during the Las Vegas market were from a company called eMoMo, a Chinese company that is one of Raffel's competitors. (*Id*. at 518–19.)

Ray responded on September 1, 2015 stating that it was "very confusing," and he would "look into it further." (*Id*. at 523, Pl.'s Ex. 43.) Ray then asked whether Raffel was claiming to hold patents in relation to cup holders with controls and lights and asked Stangl to send supporting information to share with legal and Man Wah's purchasing department "to avoid any potential conflicts or issues." (*Id*.)

The October 2015 furniture market was held in High Point, North Carolina. Stangl testified that he met with Ray at the market and discussed Raffel's patents with him. (*Id*. at 526.) Ray informed Stangl that he would never intentionally violate a patent. (*Id*.) Stangl testified that Raffel sent Man Wah more samples in November 2015 and that the samples were marked with Raffel's patent numbers. (*Id*. at 518.) Ray told Stangl that he had ordered cup holders from eMoMo but had not taken delivery or shipped any furniture to customers containing the cup holders—he had only made samples for the furniture market. (*Id*. at 526.)

Stangl testified that Raffel sent Man Wah more samples in November 2015 and that the samples were marked with Raffel's patent numbers. (*Id*. at 518.) Also in November, Ray told his colleagues at Man Wah that because eMoMo could not settle its patent issues with Raffel, Man Wah should buy its cup holders directly from Raffel. (*Id*. at 1061–64, Pl.'s Ex. 43.)

In September 2017, however, Ray sends an email to Chan stating that he does not know if RMT, Man Wah's subsidiary, can "duplicate the Raffel switch without the possibility of a lawsuit." (*Id*. at 1080, Pl.'s Ex. 195.) Ray acknowledged that he was told that Raffel had

a patent on the cup holder products. (*Id.* at 1082.) Ray also acknowledged that he "heard about" Chan being fined by Man Wah for purchasing too much Raffel product. (*Id.* at 1085.)

Then, in December 2017, Man Wah began ordering unauthorized "knockoff" cup holders from Chinese supplier, Long Rui. (*Id.* at 1069.) Stangl testified that Raffel discovered a "knockoff" cup holder in Flat Rock furniture in Pulaski, Tennessee in September 2018. (June 8 Tr. 539.) Raffel subsequently started receiving inquiries from customers and furniture retailers regarding failures of black ICH cup holders, which Raffel learned were more knockoffs. (*Id.* at 542–45.)

After the cup holders began malfunctioning, Man Wah's quality assurance person, Fabio D'Accio, contacted Wong of Man Wah in China in December 2018, stating that he "accidentally discovered the designs" of the Long Rui cup holders "belong to Raffel" and that "at some point we started using Long Rui, Chinese supplier, on top of Raffel or used less Raffel and more Long Rui cup holders." (*Id.* at 1089.) He stated that "I'm afraid we stopped using Raffel once the Long Rui cup holder was ready, and since then it's been a disaster." (*Id.* at 1091.) When Ray was questioned about whether Man Wah directed Long Rui to copy Raffel's cup holders, Ray, as the former CEO of Man Wah, pled ignorance. (*Id.* at 1106.) He explained he found this situation "tiresome" and that he was very angry about the situation. (*Id.* at 1107.)

There is ample evidence in the record to support that Man Wah intentionally copied Raffel's products from nearly the inception of the two companies' relationship. Man Wah's internal emails confirm that Man Wah was aware of Raffel's patent and was aware of the potential issues with purchasing the cheaper, "knockoff" cup holders. Man Wah investigated the scope of the patent and seemingly formed a good-faith belief that it was *valid* but continued

to copy anyway. This misconduct continued for the entirety of the two companies' business relationship. And Ray's testimony contradicting his email and attempting to explain the contradiction away with ignorance speaks to an attempt to conceal Man Wah's misconduct. Man Wah is a large company with annual sales amounting to $2.5 billion. (June 10 Tr. 844.) Such egregious behavior must be sanctioned to discourage such action in the future.

For these reasons, I find enhanced statutory damages warranted in an amount of three times the damages awarded for patent infringement. Raffel was awarded $425,300.00 in damages for patent infringement; thus, three times this amount is $1,275,900.00. Raffel will be awarded enhanced statutory damages of this amount.

### 1.2    Treble Damages for Trade Dress Infringement

Similar to the Patent Act, the Lanham Act also gives the district court discretion to award treble damages in cases of willful infringement. Section 1117(a) provides:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.
>
> ***
>
> In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a).

Treble damages are awarded if an infringer's violation "consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark," unless there

are "extenuating circumstances." *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 642 (7th Cir. 2003) (internal citation omitted); *see also Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (stating that § 1117(a) is "properly invoked when, as in this case, the infringement is deliberate").

In this case, the jury determined that Man Wah's trade dress infringement was willful. (Docket # 439 at 2.) For the same reasons explained above that I found sufficient evidence to support the jury's willfulness verdict, I find treble damages appropriate in this case for Man Wah's willful trade dress infringement. Man Wah does not attempt to establish that "extenuating circumstances" exist that explain the willful infringement. Thus, I will increase the actual damage award of $1,181,617.00 to $3,544,851.00.

### 1.3    Enhanced Award of Man Wah's Profits

The jury awarded Raffel $5.8 million in disgorgement of Man Wah's profits for trade dress infringement. (Docket # 439 at 2.) Under the Lanham Act, the Court has discretion to enhance the amount of the recovery based on the defendant's profits if the Court finds the amount of the recovery to be inadequate. 15 U.S.C. § 1117(a). At trial, Conroy testified that he was estimating Man Wah's profits as a range between $5.8 million and $11.6 million. (June 9 Tr. 774.) Considering this testimony, the jury clearly credited Conroy's testimony and awarded $5.8 million. Raffel argues that the Court should enhance the disgorgement award to $11.6 million to "provide Raffel with a full accounting of Man Wah's profits and to adequately deter future misconduct by Man Wah." (Docket # 473 at 23.)

I see no reason to disturb the jury's award and enhance the disgorged profits awarded to Raffel. Raffel acknowledges that enhanced profits may not be punitive (*id.* at 22), and Raffel

does not show that the award given by the jury is inadequate. Thus, I decline to award additional disgorged profits.

### 2. *Attorneys' Fees, Prejudgment Interest, and Non-Taxable Costs*

Raffel also requests the Court award attorneys' fees, prejudgment interest, and certain non-taxable costs. I will address each in turn.

### 2.1 Attorneys' Fees

Under both the Patent Act and the Lanham Act, the statutes provide that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285; 15 U.S.C. § 1117(a). As to the Patent Act, the Supreme Court has found:

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *see also LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384, 387 (7th Cir. 2019) (finding that "*Octane*'s standard should apply in the present context of the Lanham Act"). The *Octane* Court found that "in determining whether to award fees under a similar provision in the Copyright Act, district courts could consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at 554 n.6 (quoting *Fogerty v. Fantasy*, Inc., 510 U.S. 517, 534 n.19 (1994)).

I find that this case is "exceptional" under *Octane*, warranting an award of attorneys' fees. This case was filed in November 2018. In July 2019, the Court entered a temporary restraining order and preliminary injunction against Man Wah. (Docket # 87.) At that time,

Man Wah was ordered to implement a manufacturing process in which it would remove stickers containing Raffel's patent numbers from third-party cup holders. Man Wah was also ordered to not sell furniture having cup holders that colorably imitated Raffel's cup holders. Man Wah was also ordered to replace any of the "knockoff" cup holders with Raffel cup holders. (*Id.*) In August 2020, however, the Court granted a motion for contempt against Man Wah, finding that Man Wah violated the injunction by continuing to sell furniture with the "knockoff" cup holders between March and November 2019. (Docket # 210.)

In addition to Man Wah's continued sale of the "knockoff" cupholders during the course of the litigation, the jury specifically determined that both Man Wah's trade dress infringement and patent infringement were willful. (Docket # 439.) And while a finding of willful infringement "does not require a finding that a case is exceptional," the Federal Circuit has "uniformly indicate[d] that the willfulness of the infringement by the accused infringer may be a sufficient basis in a particular case for finding the case 'exceptional' for purposes of awarding attorney fees to the prevailing patent owner." *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir. 2004) (internal citation omitted). Although the award must be reduced to reflect Wisconsin's statutory cap, the jury awarded $97.5 million in punitive damages against Man Wah for misappropriation of Raffel's trade dress. The jury was sending a strong message that it believed Man Wah's conduct towards Raffel was particularly reprehensible. For all of these reasons, an award of attorneys' fees is proper in this case.

Given, however, that this case has been pending since November 2018, has involved multiple attorneys, and has covered a great deal of litigation, the attorneys' fees thus far are no doubt quite large. The Supreme Court has stated that a "request for attorney's fees should not result in a second major litigation" and that "ideally," the "litigants will settle the amount

of a fee." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). If settlement is not possible, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* Fee applicants should exercise "billing judgment" with respect to hours worked, *id.*, and "hours that an attorney would not properly bill to his or her client in the private sector cannot properly be billed to the adverse party under a fee-shifting statute," *Spegon v. Cath. Bishop of Chicago*, 175 F.3d 544, 552 (7th Cir. 1999).

With these instructions in mind, the Court will proceed as follows to resolve the issue of attorneys' fees:

(1) The parties are ordered to meet and confer in good faith and attempt to resolve the amount of attorneys' fees due to Raffel.

(2) If after exhausting good faith efforts the parties are unable to reach an agreement on attorneys' fees, the parties are to submit a joint report with the following:

(a) a written statement certifying that they have conferred, in good faith, to attempt to resolve this issue; and

(b) a written statement certifying that they have met and conferred on mediating this issue or submitting the issue to a Special Master.

(3) If, however, the parties are either unable to reach an agreement or are unwilling to engage in alternative dispute resolution, the parties must meet and confer and propose a briefing schedule to address the issue of attorney's fees.

The parties are warned that the Court will not look favorably on a lack of good faith effort to resolve this matter and will not allow the matter to become a "second major litigation." The parties will have **45 days** from the date of this decision to inform the Court as to the status of their fee negotiations.

2.2     Prejudgment Interest

Raffel argues that it is entitled to prejudgment interest based on the compensatory damages awarded by the jury for patent infringement, trade dress infringement, and false marking. (Docket # 473 at 35.) Raffel is not seeking prejudgment interest for its misappropriation claim under Wisconsin law. (Docket # 493 at 24 n.18.) In the absence of statutory authority, the federal common law authorizes the award of prejudgment interest in appropriate cases to victims of violations of federal law. *Gorenstein Enters., Inc.*, 874 F.2d at 436. The Patent Act specifically provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.

Man Wah does not dispute Raffel's entitlement to prejudgment interest in general; rather, Man Wah disputes the rate at which prejudgment interest should be calculated. Raffel submits a declaration of its expert, Conroy, calculating prejudgment interest for each of the claims using the prime rate, compounded monthly from the time of Man Wah's wrongdoing. (Declaration of Richard M. Conroy ("Conroy Decl."), Docket # 472.) Man Wah, on the other hand, argues that prejudgment interest should be calculated using either the three-month U.S. Treasury Bill ("T-Bill") rate or using Man Wah's own short term borrowing rate. (Docket # 488 at 49.)

Prejudgment interest under the Patent Act serves to "make the patent owner whole," as "damages properly include the foregone use of money of which the patentee was wrongly deprived." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020) (internal quotation and citation omitted). District courts are given a "wide latitude in

the selection of interest rates" and have permitted the use of statutory rates set by states, the U.S. Treasury bill rate, and the prime rate. *Id.* The Seventh Circuit has found that "[o]ur practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in 'refined rate-setting' directed at determining a more accurate market rate for interest." *First Nat. Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999). The court held that "to set aside this practice and award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation." *Id.*

I see no reason to depart from the general practice in the circuit of using the prime rate to calculate prejudgment interest. Thus, I will award prejudgment interest in the amount of $1,340,553.00 through July 31, 2022. (Conroy Decl. ¶ 7.) Raffel indicates that it will update the prejudgment interest calculation when judgment is entered. (Docket # 473 at 35.)

### 2.3    Non-Taxable Costs

Raffel also seeks certain non-taxable costs above and beyond its taxable costs under 28 U.S.C. § 1920. Specifically, Raffel seeks to recover its (i) e-discovery vendor costs; (ii) expert witness costs; (iii) courtroom information technology vendor costs; (iv) trial lodging costs; (v) deposition costs; (vi) mediator costs; and (vii) supersedeas bond costs. (Docket # 473 at 39.)

The Lanham Act provides that a prevailing party can recover the "costs of the action." 15 U.S.C. § 1117(a). The Patent Act similarly permits the recovery of "costs as fixed by the court." 35 U.S.C. § 284. As an initial matter, Man Wah argues that an award of costs is premature and should be deferred until after appeal when it is clear who the "prevailing party" is. (Docket # 488 at 45.) Man Wah argues that Raffel is not the "prevailing party." (*Id.*) A

49

litigant is a prevailing party "for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Eagle F. v. Phyllis Schlafly's Am. Eagles*, 498 F. Supp. 3d 1024, 1040 (S.D. Ill. 2020) (quoting *Hensley*, 461 U.S. at 433). Given the jury's findings in Raffel's favor on every claim put before it, Man Wah cannot reasonably contend that Raffel is not a "prevailing party" in this case.

Man Wah further argues that to the extent Raffel is entitled to any costs, it is limited to the six categories of costs specified in the general costs statute of 28 U.S.C. §§ 1821, 1920, none of which include the costs Raffel now seeks. (Docket # 488 at 45–46.) Man Wah is incorrect. Section 1920 specifically addresses the six categories of *taxable* costs included with the bill of costs filed in a case. Raffel is specifically seeking its *non-taxable costs* in this motion.

Man Wah also argues that Raffel should be limited to costs under § 1117 only, and thus only to its Lanham Act claim. (*Id.* at 46 n.25.) However, as cited above, the Patent Act also allows for the recovery of costs.

Man Wah otherwise does not develop its arguments as to why Raffel is not entitled to its costs as stated. Thus, Raffel's request for costs is granted. As with the attorneys' fees, the parties are ordered to confer and attempt to reach a resolution as to Raffel's costs in this case. If the parties are unable to reach an agreement, as with attorneys' fees, the parties should consider whether they will agree to submit this matter to mediation. And finally, only if those first two options fail, a briefing schedule will be set to decide the amount of non-taxable costs.

### 3. Permanent Injunction

Lastly, Raffel requests a permanent injunction prohibiting Man Wah from using Raffel's patent and trade dress. (Docket # 473 at 41.) A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must

demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "These familiar principles apply with equal force to disputes arising under the Patent Act," *id.*, as well as disputes under the Lanham Act, *see Fabick, Inc. v. JFTCO, Inc.*, No. 16-CV-172-WMC, 2019 WL 1320298, at *6 (W.D. Wis. Mar. 22, 2019), *aff'd*, 944 F.3d 649 (7th Cir. 2019) (applying *eBay* analysis to Lanham Act claim). The Supreme Court has cautioned, however, that "an injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

### 3.1 Irreparable Harm and Inadequate Remedies at Law

An irreparable injury is one that cannot be redressed by the available legal remedies, such as an award of money damages. *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, 323 F. Supp. 3d 1071, 1075 (W.D. Wis. 2018). Although no similar presumption exists under the Patent Act, under the Lanham Act, a "plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction." 15 U.S.C. § 1116(a).

The first two injunction factors, irreparable harm and inadequate remedies at law, "tend to coalesce when the question is whether a prevailing party is entitled to permanent injunction at the close of a case. But, critically, any purported irreparable injury must have been caused by the infringement, rather than by lawful competition or other market factors." *Ultratec, Inc.*, 323 F. Supp. 3d at 1075.

For the first two elements, Man Wah argues that Raffel presented no evidence showing Raffel lost market share or suffered any damage to its reputation, other than the self-serving statements of its own witnesses. (Docket # 488 at 40–41.) Man Wah argues that there is no reason to believe that it would resume selling the accused cup holders at issue in this litigation. (*Id.* at 41.)

As to the trade dress infringement, the Seventh Circuit has stated that "[t]his and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Commc'ns, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982). The court explained: "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Id.* (internal quotation and citation omitted).

The evidence in this case demonstrates the precise issue the Seventh Circuit raised. Raffel introduced evidence that it was a major player in the world of product development for furniture, particularly cup holders, and had a stellar reputation. The "knockoff" cup holders from Man Wah, on the other hand, were defective, causing customers to complain and look to Raffel to replace the product. The "knockoff" cup holders had stickers on them with Raffel's patent numbers. Raffel was unable to control the nature or quality of the goods Man Wah placed in the stream of commerce that infringed Raffel's trade dress and patent. Raffel produced evidence that its reputation was harmed as a result. While Man Wah argues the evidence was "self-serving" and disagrees with it, the jury determined otherwise. And no

amount of money damages can repair the damage caused to Raffel's reputation from the faulty "knockoff" cup holders.

For these reasons, I find that Raffel has met its burden of demonstrating the first two elements for a permanent injunction.

### 3.2    Balance of Hardships and Public Interest

As for the balance of hardships, Man Wah argues that Raffel faces no hardship if the Court declines an injunction, as Man Wah "long ago replaced the challenged cup holder design with a non-infringing design"; whereas Man Wah, it argues, will face significant hardship because of the bad press it will receive at Raffel's hands. (Docket # 488 at 41–42.)

Man Wah has represented multiple times in its response brief that it is no longer selling the accused cup holders. (*Id.*) If that is the case, then a permanent injunction will cause Man Wah no hardship. For Raffel, however, it wants more assurance that Man Wah's actions will cease beyond its say so. This is understandable as Man Wah has already been found to have violated the preliminary injunction imposed. And how Raffel reports the injunction in the press is not a factor I weigh into my analysis of whether Man Wah should be enjoined from selling infringing products.

As to the public interest, the public has a "general interest in the judicial protection of property rights in inventive technology," and this interest "outweighs any interest the public has in purchasing cheaper infringing products." *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013). Man Wah's argument that an injunction would not serve the public interest rests primarily on the fact that Man Wah "stopped using the challenged cup holder design years ago." (Docket # 488 at 43.) Again, if Man Wah does not plan on

selling the infringing products again, there should be no burden or hardship to Man Wah in the entry of a permanent injunction to protect Raffel's intellectual property rights.

For these reasons, I find Raffel has met the four *eBay* elements required for the entry of a permanent injunction. A permanent injunction will be entered.

### 3.3    Scope of Permanent Injunction

Man Wah argues that to the extent a permanent injunction is entered, it should be narrowly tailored to the specific conduct the jury found to be infringing and that Raffel has failed to propose such an injunction. (Docket # 488 at 43.) Of course any injunction must be narrowly tailored to the infringing conduct. Raffel states that it "simply asks the Court to permanently enjoin Man Wah from making, selling, offering, using, importing, and otherwise infringing Raffel's ICHs." (Docket # 493 at 26 n.22.) I will task the parties to confer and submit a proposed joint permanent injunction, reflecting the jury's determination of the infringing trade dress and patent. As Man Wah states that it no longer, and will no longer, sell the infringing product, the parties should be able to come to an agreement on language for a permanent injunction. Once the parties reach such an agreement, I will enter the injunction. If, and only if, after a good faith attempt to reach an agreement, the parties remain unable to agree on language, I will request both parties submit separate agreements, and I will determine the language entered.

## CONCLUSION[1]

After years of litigation and a ten-day trial, a jury in this district awarded damages in favor of Raffel and against Man Wah on each of the claims put before it. In post-trial motions,

---

[1] Raffel filed a letter dated November 30, 2022 noting several errors found in the jury trial transcript. (Docket # 498.) Man Wah has not objected to Raffel's request to correct these errors. Thus, the jury trial transcript is updated to correct these errors.

Man Wah challenges nearly every aspect of the jury's Special Verdict form. For the reasons explained above, Man Wah's motions are granted in part and denied in part. Man Wah's motion to reduce the punitive damages award for misappropriation is granted. The punitive damages award is reduced from $97.5 million to $2 million to comply with Wisconsin's statutory cap on punitive damages. Man Wah's motion to reduce certain damages as duplicative is also granted. Because the trade dress infringement actual damages are duplicative of the jury's award of damages for patent infringement and false marking, I find those damages are subsumed in the larger amount. Raffel is entitled to recover $1,181,617.00 in actual damages and $5.8 million in disgorgement of profits on its trade dress infringement claim.

Raffel has also moved post-trial for the entry of treble damages for the jury's finding of patent and trade dress infringement; enhanced profits for willful trade dress infringement; attorneys' fees, prejudgment interest and certain non-taxable costs; and a permanent injunction prohibiting Man Wah from using Raffel's patent and trade dress.

For the reasons explained above, Raffel is awarded $1,275,900.00 in enhanced statutory damages for the patent infringement and $3,544,851.00 in enhanced statutory damages for trade dress infringement. I will not, however, increase the amount of disgorged profits owed to Raffel. Raffel is awarded prejudgment interest in the amount of $1,340,553.00 through July 31, 2022 and will update the Court on the amount after judgment is entered. Raffel is also awarded attorneys' fees and non-taxable costs. The parties are ordered to confer, in good faith, and make every effort to reach a compromise as to these amounts. The parties are ordered to update the Court within **45 days** of the date of this Order as to their efforts to settle these matters.

Finally, a permanent injunction is entered against Man Wah in favor of Raffel prohibiting Man Wah from infringing on its patent and trade dress as found by the jury. The parties are ordered to confer in good faith and attempt to reach a compromise on the language of the permanent injunction. The parties have **45 days** to update the Court as to their efforts in reaching an agreement. If the parties are unable to reach an agreement, they must submit two individual versions of the permanent injunction.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that Man Wah's post-trial motions (Docket # 466) are **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Raffel's post-trial motions (Docket # 473) are **GRANTED IN PART AND DENIED IN PART**.

**FINALLY, IT IS ORDERED** that Raffel's motion to seal (Docket # 496) is **GRANTED**.

Dated at Milwaukee, Wisconsin this 11th day of May, 2023.

BY THE COURT

_____

NANCY JOSEPH
United States Magistrate Judge